**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 4 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

CHRISTOPHER A. SMITH,

      Defendant-Appellant.

No. 97-1320

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 96-CR-491-S)

---

Jenine Jensen, Assistant Federal Public Defender (Michael G. Katz, Federal
Public Defender, with her on the brief), Denver, Colorado, for Defendant-
Appellant.

Stacey Ross Goh, Assistant United States Attorney (Henry L. Solano, United
States Attorney, with her on the brief), Denver, Colorado, for Plaintiff-Appellee.

---

Before **HENRY** , **BARRETT** , and **BRISCOE** , Circuit Judges.

---

**HENRY** , Circuit Judge.

---

    A grand jury charged Defendant Christopher Smith with the following

offenses:  1) interference with commerce by threats or violence, in violation of

the Hobbs Act, 18 U.S.C. § 1951; and 2) theft from a federally licensed firearms dealer, in violation of 18 U.S.C. § 922(u). A jury found him guilty on both counts. Mr. Smith contends that the district court erred in the following respects: 1) allowing introduction of eyewitness identifications in violation of his due process rights; 2) excluding the testimony of his expert witness; 3) allowing the government to cross-examine one of his witnesses regarding her prior drug use; 4) denying his motion for judgment of acquittal on the Hobbs Act count; and 5) ordering restitution in an amount greater than the loss he caused. We affirm in part, reverse in part, and remand with instructions.

## I. STATEMENT OF THE CASE

### A. Factual Background

On the evening of January 15, 1996, two men entered a sporting goods store in Colorado Springs. They walked up to the gun counter, and one of them asked a sales associate if he could see two .45 caliber semiautomatic handguns from the display case. The sales associate, Glen Dotson, cleared the two guns to make sure they were unloaded. He then handed the man the guns, one at a time. Once the man had the guns in his hands, he began to move down the counter. Then he turned and ran out of the store. His companion ran also.

2

Mr. Dotson yelled for help as he chased the two men. Two employees, Keith Stotts and George MacLarty joined the chase. The suspect[1] got into the driver's seat of a black Nissan 300ZX sports car. Although it was dusk or dark at the time of the escape, the parking lot of the store was well-illuminated. Mr. MacLarty testified that he saw the driver through the car window from about one foot to one and a half feet away. Rec. vol. V at 233. As the getaway car lurched out of the parking lot, Mr. Stotts and Mr. Dotson were in the car's path. Mr. Stotts testified that he got a good look at the driver through the windshield. Id. vol. IV at 120. On its way out of the parking lot, the car struck Mr. Dotson and broke his ankle. Mr. Dotson was unable to see the driver as the car was coming toward him. Id. at 81. Another employee, Brian Cunico, happened to be in the parking lot during the chase. He also testified that he saw the driver through the windshield. Id. vol. V at 164.

After the men fled, the employees talked with one another about the incident. Id. at 137-38. When a Colorado Springs police officer arrived, the employees gave their statements to the officer in each others' presence and then discussed their statements with each other. Jennifer Sherman, who worked as a cashier at the sporting goods store on the evening of the theft, testified that on

_____

[1]Although there were two perpetrators of the crime, this case concerns the identity of the man who took the guns. Thus, we shall refer to "the suspect" in the singular.

3

the night of the theft and the following day, store employees were discussing their memories of the details of the suspect.  She stated that at first, the employees' descriptions differed, but eventually everyone started agreeing as to what he looked like.    Id. vol. VII at 549.

The following day, Agent Scott Thomasson of the Bureau of Alcohol, Tobacco and Firearms became involved with the case.  Agent Thomasson interviewed the six employees who were in the store at the time of the theft.  A couple days later, Agent Thomasson took Mr. Stotts and Mr. MacLarty to the Sheriff's Office to create computer composites of the suspect.  He also took them to a sketch artist, who used their input to create a sketch of the suspect.

Agent Thomasson enlarged the resulting sketch and made it into a "wanted" poster.  He took the poster to Doherty High School, the high school nearest the scene of the theft, and he gave the poster to the school principal.  A teacher at Doherty thought he recognized the person in the sketch as a former Doherty High School student, Mr. Christopher A. Smith.  The principal then obtained yearbooks containing Mr. Smith's sophomore and junior yearbook photos.  In the sophomore photo, Mr. Smith was fifteen years old; in the junior photo, he was sixteen.  At the time of the theft he was nineteen years old, and at trial he was twenty.  Agent Thomasson requested a copy of the photo of Mr. Smith in his junior year, and he also requested seven other photos from the same

4

yearbook.

Agent Thomasson took the eight photos to the sporting goods store; however, he did not mount them to create a photo array. Instead, he laid the photos onto the counter and asked Mr. Stotts if he could identify the suspect. The names of the persons in the photos were not concealed. Thus, "Christopher Smith" was printed on the bottom of Mr. Smith's photo. After Mr. Stotts picked the picture of Mr. Smith, Agent Thomasson indicated that Mr. Stotts had picked the correct photo. Rec. vol. V at 146. Agent Thomasson had Mr. Stotts sign and date the back of Mr. Smith's photo.

Agent Thomasson then repeated this procedure with Mr. Cunico. Mr. Cunico had attended Doherty High School, and he recognized Mr. Smith and one other person as Doherty High students. When Mr. Cunico selected the picture of Mr. Smith, Agent Thomasson had him sign and date the back of Mr. Smith's photo. A few days later, Agent Thomasson told Mr. Cunico that he had picked the picture of the suspect. Id. at 178.

Agent Thomasson then showed the photographs to Mr. MacLarty. When Mr. MacLarty picked Mr. Smith's photo, Agent Thomasson had him sign and date the back. Agent Thomasson "might have said, Nice job, or something like that" after Mr. MacLarty picked Mr. Smith's photo. Id. at 259.

Agent Thomasson also showed the photos to Kathy Walker, who was

5

working as a "greeter" at the sporting goods store on the evening of the theft. She was able to see the suspect when he was at the gun counter. He came within ten feet of her as he was running out of the store. Ms. Walker picked the photo of Mr. Smith.

On the evening of the theft, Mr. Dotson had told police that he could not identify the suspect. Approximately a week after the theft, Agent Thomasson showed Mr. Dotson the photographs, but Mr. Dotson told him that he did not recognize anyone. Agent Thomasson told Mr. Dotson to take his time and look at the photographs. He then left Mr. Dotson alone in an office for about five minutes. As with the other interviews, the photos were not mounted; they were lying loose on a table. By this time, approximately three or four of Mr. Dotson's co-employees had signed and dated the back of Mr. Smith's photo. Mr. Dotson picked Mr. Smith's photograph. When Agent Thomasson returned to the room, he informed Mr. Dotson that everyone else had picked the picture of Mr. Smith also.

On two occasions, Agent Thomasson interviewed Ms. Sherman. The first interview took place within forty-eight hours of the theft. At that time, she told him that she "absolutely could not identify" the suspect.    Id. vol. VII at 550. During the next couple of weeks, Agent Thomasson called Ms. Sherman five times to ask if she could describe the suspect for a sketch artist. She told Agent

6

Thomasson that she "[did not] have enough to go by."     Id. at 551.

The second interview took place at the police station at around 9:00 or 9:30 p.m.  At that interview, Agent Thomasson showed Ms. Sherman the photos. She told him several times that she could not identify anyone.  Eventually Mr. Thomasson told her to guess.  Agent Thomasson then removed the photos, brought out a single mug shot of Mr. Smith, and told her this was "the guy that other people had said did it . . . ."     Id. at 555.  He told her this was off the record, and he asked her if she recognized the man in the mug shot.  She testified that she said something like, "I guess" because it was late and she wanted to go home. Id. at 556.

### B.  Procedural History

Mr. Smith was charged with interference with commerce by threats or violence, in violation of the Hobbs Act, 18 U.S.C. § 1951, and theft from a federally licensed firearms dealer, in violation of 18 U.S.C. § 922(u).  At Mr. Smith's first trial, the jury could not reach a unanimous verdict, and the judge declared a mistrial.  Subsequently, a grand jury returned an indictment charging Mr. Smith with the same two counts.  At his second trial, a jury convicted him on both counts.  The district court sentenced Mr. Smith to eighty-seven months' imprisonment on both counts, to run concurrently.  The court further ordered Mr.

7

Smith to pay $1,209.98 in restitution to the sporting goods store.

## II. DISCUSSION

### A. Did the identification procedures Agent Thomasson used violate Mr. Smith's due process rights?

Mr. Smith argues that the procedures used by Agent Thomasson resulted in unreliable pre-trial identifications, introduction of which violated his due process rights. He also argues that these unreliable pre-trial identifications tainted the in-court identifications. The government counters that the identification procedures Agent Thomasson used were proper, and the identifications themselves were reliable. The ultimate question of whether identification procedures violate a defendant's due process rights is a question of law, which we review de novo. United States v. Sanchez, 24 F.3d 1259, 1262 (10th Cir. 1994).

When the constitutionality of a photo array is challenged under the Due Process Clause, the court must engage in a two-pronged inquiry. First, we must determine whether the photo array was impermissibly suggestive. If so, then we must decide whether the identifications were nevertheless reliable considering the totality of the circumstances. Id. at 1261-62. Courts may consider several factors in determining whether a photo array is impermissibly suggestive, including "the size of the array, the manner of its presentation by the officers,

8

and the details of the photographs themselves." Id. at 1262.

### 1. Were the Photo Arrays Impermissibly Suggestive?

#### a. Size of the Array

Mr. Smith takes issue with the number of photographs Agent Thomasson showed to each of the witnesses. Although Agent Thomasson testified that he showed all eight photographs to each of the witnesses, some of the witnesses testified otherwise. For example, Mr. Cunico testified that Agent Thomasson showed him approximately six photos. Rec. vol. V at 167. Mr. Dotson testified that he believed Agent Thomasson showed him four or five photos. Id. vol. IV at 90. We have stated that "the number of photographs in an array is not itself a substantive factor, but instead is a factor that merely affects the *weight* given to other alleged problems or irregularities in an array." Sanchez, 24 F.3d at 1262. Further, we have noted that "courts have held that a photo array with as few as six pictures is not per se unconstitutional." Id. However, we observed that six photos is "a number sufficiently small to weigh heavily in the balance of factors to be considered." Id. at 1263. We turn, then, to the other factors to be considered in deciding whether a photo array is impermissibly suggestive.

#### b. Manner of the Array's Presentation

As to the second factor, Mr. Smith argues that the manner in which Agent Thomasson presented the photos to the eyewitnesses was overly suggestive. First

9

of all, he argues that it was improper for Agent Thomasson to leave the names on the photographs while showing them to some of the eyewitnesses. We think that leaving the names on the photos was particularly problematic with respect to Mr. Cunico. This is so because the pictures depicted students from a nearby high school that Mr. Cunico had recently attended.

Secondly, Mr. Smith argues that it was improper for Agent Thomasson to coach the witnesses. Several of the witnesses testified that after they picked Mr. Smith's photo, Agent Thomasson stated or implied that they had picked the correct photo. He also had them sign and date the back of the photo, so that each subsequent witness eventually saw the signatures of his or her co-employees on the photo. Although we cannot condone the agent's procedure in this respect, we think it falls short of "coaching."

However, we think the agent's behavior bordered on coaching with respect to two of the eyewitnesses. Agent Thomasson pressed Ms. Sherman and Mr. Dotson to assume that the suspect's picture appeared in the array. When Mr. Dotson had difficulty picking the suspect, Agent Thomasson left him alone in the room with loose photos, one of which had signatures on the back. Moreover, he actually showed Ms. Sherman a mug shot of Mr. Smith and told her "off the record" that Mr. Smith was the suspect.

*c. Details of the Photographs*

10

As to the third factor–the details of the photographs themselves–Mr. Smith argues that Agent Thomasson should not have used a photo of him when he was sixteen years old because he was nineteen years old at the time of his arrest. He claims that the difference in his appearance from age sixteen to age nineteen is significant. Mr. Stotts testified, however, that he did not think there was much of a change in Mr. Smith's appearance from the time of the photo to the time of trial, when Mr. Smith was twenty. Although we recognize that the difference in appearance from a sixteen-year-old to a nineteen-year-old may be significant, Mr. Smith has not demonstrated that is so in this case.

After considering the above factors, we conclude that the photo arrays shown to Mr. Cunico, Mr. Dotson, and Ms. Sherman were impermissibly suggestive. As we noted above, Mr. Cunico testified that there were approximately six photos in the array Agent Thomasson showed to him, and Mr. Dotson testified that there were four or five. These are numbers sufficiently small to weigh heavily in balancing the other factors.

As to Mr. Cunico, as we have discussed, the fact that the names were left on the photos presented a problem because he had recently attended Doherty High School. Furthermore, Mr. Cunico recognized at least two of the individuals in the array as Doherty High students. As to Mr. Dotson and Ms. Sherman, as we

11

have discussed, Agent Thomasson pressed them to assume that the array contained a photo of the suspect. We, therefore, must turn to the second prong, i.e., whether, in view of the totality of the circumstances, the identifications were nevertheless reliable. However, we need only determine whether Mr. Cunico's and Mr. Dotson's identifications were reliable, since Ms. Sherman never made a positive identification, and at trial she testified on behalf of the defense.

### 2. Were the Identifications Nevertheless Reliable?

The Supreme Court has enumerated five factors for courts to consider in determining whether a pretrial identification is reliable:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Grubbs v. Hannigan, 982 F.2d 1483, 1490 (10th Cir. 1993) (quoting Neil v. Biggers, 409 U.S. 188, 199-200 (1972)). These five factors "must be weighed against the corruptive effect of a suggestive pre-trial identification procedure to determine whether the identification testimony should have been suppressed." Id. The standard is whether there is a very substantial likelihood of misidentification. Neil, 409 U.S. at 198. We turn now to a discussion of the five factors.

*a. Opportunity to View*

The government argues that each of the eyewitnesses viewed the suspect

12

anywhere from a few seconds to a few minutes at close range and that each of these instances was long enough for the witnesses to retain a clear mental image of the suspect. Mr. Cunico testified that he saw the driver through an untinted windshield when the car was under a light post. He testified that he has 20/30 vision and that he was approximately 15 feet away from the car. Although Mr. Dotson was unable to see the driver in the parking lot, he did have the opportunity to view the suspect at close range when they were standing at the gun counter. He testified that the suspect was a little over an arm's length away from him and that he was looking at the man's face as he handed him the guns.

### b. Degree of Attention

The government argues that based on the details the eyewitnesses recalled, it is apparent that they paid close attention to the suspect. Mr. Smith concedes that the degree of attention was probably high, but he argues that the witnesses were more concerned with marking the getaway car than remembering the suspect's face. However, Mr. Dotson testified that he is more attentive with a customer who is looking at firearms than he is with a customer who is looking at other sporting goods.

### c. Accuracy of Description

When the employees gave their statements to Agent Thomasson, they almost all described the suspect as a white male, 5 feet 10 inches tall, 150

13

pounds, with hair between sandy blond and brown.  Rec. vol. VI at 386.  Mr. Smith argues that the accuracy of the prior descriptions, however, was tainted by the conversations and interviews that occurred shortly after the theft.

### d. Level of Certainty

At trial, when counsel asked Mr. Cunico how sure he was when he picked Mr. Smith's photo, Mr. Cunico responded, "That's the guy I remembered that night."  Rec. vol. V at 182.  Mr. Dotson, who was at first unable to identify the suspect, eventually picked Mr. Smith's picture.  He testified that he "was real, real sure" that he had identified the individual who took the guns from him.        Id. vol. IV at 91.

### e. Time Between Crime and Confrontation

Mr. Smith concedes that the length of time between the theft and the pretrial identification is not problematic.


We cannot say, weighing each of these factors, and balancing them against the suggestiveness of some of Agent Thomasson's procedures with respect to Mr. Cunico and Mr. Dotson, that there is a very substantial likelihood of misidentification.  First of all, three other employees identified Mr. Smith.  Thus, Mr. Cunico's and Mr. Dotson's positive identifications were corroborated.  Moreover, both Mr. Cunico and Mr. Dotson had an opportunity to view the

14

suspect at fairly close range–Mr. Dotson in a well-lit store, and Mr. Cunico in a well-lit parking lot. Mr. Dotson was particularly attentive to the suspect since he was handling firearms. And both Mr. Cunico and Mr. Dotson were certain that they had picked the photo of the man they saw on the evening of the theft. Therefore, we hold that admission of the pre-trial identifications did not violate Mr. Smith's due process rights. In light of this holding, and since Mr. Smith's only ground for challenging the in-court identifications was the unreliability of the pre-trial identifications, we likewise conclude there was no error in admitting the in-court identifications.

**B. Did the district court abuse its discretion in excluding Mr. Smith's proffered expert testimony on eyewitness identification?**

The defense proffered the testimony of Dr. Geoffrey Loftus, an expert on the subject of eyewitness identification. The government filed a motion in limine, seeking to exclude Dr. Loftus's testimony. After a hearing, the district court granted the government's motion. We review the decision to exclude expert testimony for an abuse of discretion. United States v. Call, 129 F.3d 1402, 1405 (10th Cir. 1997), cert. denied, 118 S. Ct. 2064 (1998).

According to Fed. R. Evid. 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of

15

an opinion or otherwise.

Under Daubert v. Merrell Dow Pharmaceuticals, Inc. , 509 U.S. 579 (1993), a district court faced with a proffer of expert testimony must first determine whether it is reliable. Call, 129 F.3d at 1404. After determining that the proffered testimony is reliable, the district court must then determine whether the evidence will assist the trier of fact. Id.

During the defense's proffer, Dr. Loftus testified extensively about various factors that affect eyewitness identification and the circumstances that give rise to inaccurate memories. For example, he testified that bright lights in a parking lot at night, as well as window tinting, could affect the ability to see and remember. Also, he testified that highly stressful events impair the ability to remember. He further testified that a person's confidence in his or her memory does not necessarily correlate to the accuracy of that memory. He testified as to "relation back," whereby an initial identification can influence a later identification. He testified about the "feedback factor," whereby post-event information may affect the accuracy of a memory. Finally, he testified about "unconscious transference," which allows someone to remember a face but not the circumstances under which he or she saw the face.

"Until fairly recently, most, if not all, courts excluded expert psychological testimony on the validity of eyewitness identification. But, there has been a trend

16

in recent years to allow such testimony under circumstances described as 'narrow.'" United States v. Harris , 995 F.2d 532, 534 (4th Cir. 1993) (citations omitted). "The narrow circumstances held sufficient to support the introduction of expert testimony have varied but have included such problems as cross-racial identification, identification after a long delay, identification after observation under stress, and [such] psychological phenomena as the feedback factor and unconscious transference." Id. at 535. "Outside of such narrowly constrained circumstances, jurors using common sense and their faculties of observation can judge the credibility of an eyewitness identification, especially since deficiencies or inconsistencies in an eyewitness's testimony can be brought out with skillful cross-examination." Id.

In Harris , the defendant, on trial for robbery, challenged the district court's exclusion of expert testimony on the reliability of eyewitness identification. Id. at 534. He argued that because the eyewitnesses discussed the robbery amongst themselves, they could have reinforced each other's misidentifications. Id. The court noted that the defendant's proffer included most of the common justifications for admitting eyewitness identification expert testimony. Nevertheless, the court concluded that "the facts simply do not support his argument that the identification was suspect." Id. at 535. The court rested this conclusion on the fact that there was more than one identification. Thus, the jury

"could pick and choose from an evidentiary cornucopia." Id. Accordingly, the Fourth Circuit affirmed the district court's exclusion of the expert testimony. Id. at 536.

Several other circuits, pre- and post- Daubert, have affirmed the exclusion of such testimony, while simultaneously eschewing a rule of per se inadmissibility. See, e.g., United States v. Rincon, 28 F.3d 921, 926 (9th Cir. 1994) (upholding the district court's exclusion of expert eyewitness identification testimony while noting that such a determination must be "based upon an individualized inquiry"); United States v. Moore, 786 F.2d 1308, 1312 (5th Cir. 1986) (upholding the district court's exclusion of eyewitness identification expert testimony while recognizing that admission would be proper in some cases); see also United States v. Downing, 753 F.2d 1224, 1226 (3rd Cir. 1985) (reversing the district court's exclusion of expert eyewitness identification testimony while holding that the admission of such testimony is not automatic but conditional); cf. United States v. Brown, 540 F.2d 1048, 1053-54 (10th Cir. 1976) (affirming the district court's exclusion of expert testimony regarding eyewitness identification without discussing possibility of admission under other circumstances).

It is clear to us from a review of the record that the district court considered this matter in detail. The court conducted a lengthy Daubert hearing,

18

and it made extensive findings of fact and conclusions of law. The court did not rely on a rule of per se inadmissibility. Indeed, it recognized that the trend is to admit expert testimony on eyewitness identification under certain circumstances, which should be examined on a case-by-case basis. The court found, however, that in the instant case, the proffered testimony touches "on areas of common knowledge." Rec. vol. VIII at 680. Thus, it concluded that the testimony would not assist the trier of fact.

The defendant urges us to adopt the Third Circuit's approach in United States v. Stevens, 935 F.2d 1380 (3rd Cir. 1991). In Stevens, the defendant sought to introduce expert testimony concerning eyewitness identification. Id. at 1384. Both of the eyewitnesses to the crime "proclaimed that they were exceedingly confident in their identifications of [the defendant]." Id. at 1400. The expert would have testified about the lack of correlation between confidence and accuracy in eyewitness identifications. Id. The district court excluded this portion of the expert's testimony. Id. at 1397. Relying on Downing, the Third Circuit reversed. Id. at 1401.

We agree that expert testimony on eyewitness identification may properly be admitted under Daubert in certain circumstances, but Stevens simply does not persuade us that the district court abused its discretion in the instant case. We note that here there were five eyewitness identifications, not one. Likewise, as

19

counsel for the government pointed out at argument, there was also testimony that Mr. Smith changed his alibi. In this admittedly close case, we hold only that the district court did not abuse its discretion in excluding the testimony under the circumstances. See United States v. Blade, 811 F.2d 461, 465 (8th Cir. 1987) (holding no abuse of discretion to exclude expert eyewitness identification testimony where government's case relied on more than eyewitness identification); United States v. Smith, 736 F.2d 1103, 1107-08 (6th Cir. 1984) (holding exclusion of expert eyewitness identification testimony harmless error where government's case included three separate eyewitnesses and a palm print that discredited the defendant's alibi).

Finally, Mr. Smith argues that not only did the district court exclude the expert testimony as unhelpful to the trier of fact, but it also excluded the testimony because the testimony touched on the ultimate issue in the case. As Mr. Smith points out, the "ultimate issue" rule has been abolished. See Fed. R. Evid. 704 & Advisory Committee Notes ("the so-called 'ultimate issue' rule is specifically abolished by the instant rule.") We have reviewed the record, and we do not think the court erred. Throughout the hearing, the court was clearly guided by the standards announced in Daubert and Rule 702. In any event, because the court did not abuse its discretion in excluding the testimony, if the court did err in this respect, such error was harmless.

**C. Did the district court abuse its discretion in allowing an alibi witness to be cross-examined on her drug use twenty years earlier?**

Mr. Smith's alibi was that at the time of the theft, he was with his friend Jamie Doyle at her house. Jamie's mother, Janet Doyle, testified that she saw Mr. Smith and her daughter leave the house around 6:55 p.m. on the evening of the theft, just after she got home from work. Ms. Doyle testified that she remembered the date because it was Martin Luther King Day, and many employees at her workplace had the day off. Ms. Doyle further testified that she remembered the time because she was surprised to see her daughter leaving the house just minutes before the television program Melrose Place was scheduled to air. The theft took place between 6:30 p.m. and 7:00 p.m.

Ms. Doyle was Mr. Smith's primary alibi witness. Over defense objection, the district court permitted the government to cross-examine Ms. Doyle about her use of LSD twenty years earlier. The court also questioned Ms. Doyle on the same topic. Mr. Smith argues that the district court erred when it allowed this line of questioning. Mr. Smith further argues that the judge compounded the error when he took up the questioning himself.

"[T]he extent of cross-examination with respect to any appropriate subject is within the sound discretion of the trial court." United States v. Hinkle, 37 F.3d 576, 579 (10th Cir. 1994). Likewise, we review a trial judge's own

questioning for an abuse of discretion. United States v. Albers, 93 F.3d 1469, 1484 (10th Cir. 1996). Under this standard, we will reverse only when the trial court's decision is "arbitrary, capricious, whimsical, or manifestly unreasonable." United States v. Hernandez-Herrera, 952 F.2d 342, 343 (10th Cir. 1991) (internal quotation marks omitted).

Mr. Smith argues that the cross-examination concerning Ms. Doyle's drug use was aimed at generally attacking Ms. Doyle's character, an improper purpose for raising the topic. The government, however, argues that Ms. Doyle's ability to remember the events of the evening of January 15, 1996 was directly in issue, and, therefore, her prior use of LSD was relevant. Both parties cite United States v. Cameron, 814 F.2d 403 (7th Cir. 1987) in support of their respective positions.

In Cameron, the defense sought to impeach a government witness by cross-examining him about his prior use of LSD. Id. at 405. The defense's rationale was that individuals who use illegal drugs are likely to have no compunction about lying under oath. Id. The district court refused to admit the evidence for this purpose; however, the district court offered to allow the defense to introduce the evidence to show the effect that drug use may have had on the witness's memory. Id. The defense declined the offer. Id. On appeal, the defendant argued that the district court should have allowed him to introduce evidence of prior drug use to impeach the witness's character. Id. The Seventh Circuit

22

disagreed and affirmed the district court.    Id.

In the case at bar, when defense counsel objected to the government's questioning concerning Ms. Doyle's LSD use, the prosecutor stated that such evidence goes "to her credibility to recall and recollection, her memory." Rec. vol. VIII at 723. Thus, unlike in    Cameron , the evidence was offered for a proper purpose. We think it was reasonable for the court to allow this inquiry. While the use of certain drugs in the remote past may be entirely irrelevant to a witness's ability to remember, in this instance, it was for the jury to decide whether Ms. Doyle's use of LSD twenty years earlier affected her ability to recall the evening in question. We cannot say that the district court abused its discretion in allowing this line of questioning. We turn now to the court's own questioning of Ms. Doyle.

When counsel for the government asked Ms. Doyle how many times she used LSD, she stated that she did not know. After defense counsel lodged an objection, the court asked Ms. Doyle if she recalled how many times she used LSD. When Ms. Doyle replied, "No," the court then inquired if she had used it regularly. After Ms. Doyle again replied, "No," the court admonished counsel for the government as follows: "You may inquire as to how regularly she used it and over what period of time, and let's move on." Counsel elected to move on rather than to pursue the topic. Rec. vol. VIII at 724.

23

A trial judge's authority to question a witness "is, of course, beyond dispute." Albers, 93 F.3d at 1485. However, "in exercising this power a judge must take care not to create the appearance that he or she is less than totally impartial." Id. We find nothing in the trial judge's brief questioning that suggests an appearance of partiality. Nor was the judge's questioning arbitrary or unreasonable. Thus, we find that the trial court did not abuse its discretion when it briefly questioned Ms. Doyle.

### D. Did the district court err in denying Mr. Smith's motion for judgment of acquittal on the Hobbs Act count of the indictment?

After the government rested its case, Mr. Smith moved, pursuant to Fed. R. Crim. P. 29, for judgment of acquittal on count one of the indictment. The district court denied the motion. "We review the district court's denial of a motion for judgment of acquittal *de novo*, viewing all the evidence and drawing all reasonable inferences in a light most favorable to the government." United States v. Lampley, 127 F.3d 1231, 1242 (10th Cir. 1997), cert. denied, 118 S. Ct. 1098 (1998). We conclude that the district court erred in denying Mr. Smith's motion.[2] Therefore, we vacate Mr. Smith's conviction on count one and remand

---

[2]The parties frame the issue as whether the district court abused its discretion in failing to dismiss count one of the indictment. Although Mr. Smith did raise issues relevant to the Hobbs Act count in a pretrial motion in limine, the parties have not called our attention to a formal motion to dismiss this count of
(continued...)

24

with instructions to enter judgment of acquittal on that count.

Count one of the indictment charges a violation of the Hobbs Act. The Hobbs Act provides that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion . . ." shall be punished. 18 U.S.C. § 1951(a). The Act defines "robbery" as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, *by means of actual or threatened force, or violence, or fear of injury*, immediate or future, to his person or property, or property in his custody or possession . . . ." Id. at § 1951(b)(1) (emphasis added).

The government contends that "the offense of robbery continues throughout the escape phase of the crime." Aple's Brief at 21. Thus, it argues, Mr. Smith committed a robbery because Mr. Dotson's ankle was broken during the escape. In support of this argument, the government offers various cases which stand for the proposition that the escape phase of a bank robbery is part of the ongoing crime. See, e.g., United States v. Willis, 102 F.3d 1078, 1083 (10th Cir. 1996) (stating that escape is part of overall conspiracy to commit bank

---

[2](...continued)
the indictment. Likewise, our search of the record reveals no such motion. Nevertheless, Mr. Smith did make a Rule 29 motion at trial, and, consequently, we treat this issue as a denial of a motion for judgment of acquittal.

robbery), <u>cert. denied</u>, 117 S. Ct. 2517 (1997); <u>United States v. Von Roeder</u>, 435 F.2d 1004, 1010 (10th Cir. 1970) ("The escape phase of a crime is not . . . an event occurring after the robbery.  It is part of the robbery.") (internal quotation marks omitted), <u>vacated on other grounds</u>, <u>Schreiner v. United States</u>, 404 U.S. 67 (1971).  Mr. Smith, on the other hand, argues that "[t]he escape phase of a theft does not transform the nature of the original crime from a theft into a robbery."  Aplt's Opening Brief at 39.  We agree with Mr. Smith.

As noted above, the Hobbs Act defines "robbery" as the unlawful taking of property by "means of actual or threatened force, or violence, or fear of injury . . . ."  18 U.S.C. § 1951(b)(1).  By contrast, "theft" (or "larceny") involves the taking of property without the owner's consent, but without force or violence. <u>See</u> Black's Law Dictionary 1477 (6th ed. 1990) (defining "theft" as "[t]he fraudulent taking of personal property belonging to another, from his possession . . . without his consent, with intent to deprive the owner of the value of the same, and to appropriate it to the use or benefit of the person taking."); <u>id.</u> at 881 (defining "larceny" as the "[f]elonious stealing, taking and carrying, leading, riding, or driving away another's personal property, with intent to convert it or to deprive owner thereof."); <u>see also</u> 2 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 8.11(d) (1986) ("Robbery requires that the taking be done by means of violence or intimidation.  Larceny from the person or presence

26

of the victim is not robbery without this added element of force or fear.")

In denying Mr. Smith's motion for judgment of acquittal, the district court found that there was sufficient evidence of force or fear for the Hobbs Act count to go to the jury. The court noted that there was testimony that Mr. Smith intentionally directed his car at the employees who chased him into the parking lot and that he could have avoided doing so. Rec. vol. VI at 470. The court also noted that there was testimony that the employees in the store may have seen Mr. Smith carrying the guns, and they may not have known that the guns were unloaded. Id. at 471. The district court concluded that this evidence was enough to satisfy the force or fear elements of a Hobbs Act robbery.

As noted above, the Hobbs Act requires that a defendant take property *by means of* actual or threatened force or violence. Here, Mr. Dotson handed two guns to someone who he obviously thought was an ordinary customer. The "customer" then simply turned and ran. Even the government concedes, albeit in a discussion of a separate issue in this case, that Mr. Smith was not pointing a gun at Mr. Dotson nor demanding money from him. Aple's Brief at 15. In fact, Mr. Smith did not threaten Mr. Dotson at the gun counter in any way.

As for fear of injury, Mr. Dotson knew that the guns were unloaded because he had secured them before handing them to Mr. Smith. Even if other employees who saw Mr. Smith running with the guns thought the guns were

27

loaded, there is no evidence that Mr. Smith brandished the guns or in any way threatened any store employee. The evidence shows that he simply made his way toward the door and ran into the parking lot.

The fact that several employees followed Mr. Smith into the parking lot, and that Mr. Dotson was injured by the getaway car, does not support a finding that Mr. Smith took the guns by means of force or violence. We think there was insufficient evidence to prove that Mr. Smith accomplished the theft by means of actual or threatened force or violence. Therefore, the district court should have granted Mr. Smith's motion for judgment of acquittal on count one of the indictment.

Because we are vacating Mr. Smith's conviction on count one, we shall remand for resentencing on the remaining count. The Presentence Report indicates that counts one and two were grouped together for sentencing purposes. Now that the § 922 conviction is the only one remaining, Mr. Smith's offense level will need to be recalculated.

**E. Was the district court's restitution order erroneous?**

The district court ordered restitution in the amount of $1,209.98 to cover the cost of both guns stolen from the sporting goods store. Mr. Smith did not object to the order of restitution. Therefore, we review the order for plain error.

See Fed. R. Crim. P. 52(b); United States v. Wainwright, 938 F.2d 1096, 1098 (10th Cir. 1991).

In crimes such as the one committed by Mr. Smith, federal law requires that the sentencing court order the defendant to make restitution to the victim. See 18 U.S.C. § 3663A(a)(1). However, a district court may not order restitution in an amount that exceeds the loss caused by the defendant's conduct. United States v. Spring, 80 F.3d 1450, 1463 (10th Cir. 1996). Such a restitution order would amount to an illegal sentence. United States v. Arutunoff, 1 F.3d 1112, 1121 (10th Cir. 1993). "[T]he imposition of an illegal sentence constitutes plain error." Wainwright, 938 F.2d at 1098.

Mr. Smith argues that the district court ordered him to pay restitution in an amount greater than the loss he caused the sporting goods store. Although the record on appeal does not include a copy of the sentencing hearing transcript, both parties apparently agree that the government did not present evidence at the hearing concerning the appropriate amount of restitution. The government bears the burden of proving the amount of loss when seeking restitution. United States v. Copus, 110 F.3d 1529, 1537 (10th Cir. 1997). A restitution order entered without proof of loss is clearly erroneous. United States v. Herndon, 982 F.2d 1411, 1421-22 (10th Cir. 1992). Because that is what occurred here, the restitution order appears to be illegal. Thus, imposition of the order constitutes

plain error.

## III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's denial of judgment of acquittal on count one of the indictment and VACATE Mr. Smith's conviction on that count. We REMAND for the district court to enter judgment of acquittal on count one and for resentencing.