**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 23-10544

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

JY'QUALE SAMARI GRABLE,
a.k.a. Jy,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:22-cr-00042-SCB-CPT-1

————————————

Before JORDAN, LAGOA, and TJOFLAT, Circuit Judges.

JORDAN, Circuit Judge:

The Hobbs Act, 18 U.S.C. § 1951(a), in part prohibits "robbery" which affects commerce or the movement of any article or commodity in commerce. The Act defines "robbery" as the

"unlawful taking or obtaining of personal property from the person, or in the presence of another, *by means of* actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property."  § 1951(b)(1) (emphasis added).

We hold today that a taking of property does not constitute robbery under the Hobbs Act unless force or threatened force is used before or during the taking.  Because Jy'Quale Grable used force only after one of his co-conspirators had stolen marijuana and carried it away, we set aside his § 1951(a) conviction, as well as his 18 U.S.C. § 924 conviction, which was premised on the alleged robbery.

## I

We set out the facts in the light most favorable to the jury verdict.  *See United States v. Mapson*, 96 F.4th 1323, 1328 (11th Cir. 2024).

## A

In December of 2020, Mr. Grable and his two co-conspirators, Elijah Bell and Aquavius Smith, agreed to commit a robbery—what they described as a "buck" or a "lick"—to take marijuana from Bryer Bowling, whom Mr. Grable knew.  Mr. Bell and Mr. Smith learned of the plan from Mr. Grable on the afternoon of the incident.[1]

---

[1] Mr. Bell described a "buck" as "[l]ike take something from somebody" or "[s]teal something from somebody[.]"  Mr. Smith similarly described a "lick," which he understood to be the same as a "buck."

Despite agreeing to the "buck," the three men did not develop a plan beyond stealing the marijuana. And unbeknownst to Mr. Bell (but not Mr. Smith), Mr. Grable was armed with a gun during the incident.

**1**

On the day of the theft, Mr. Grable communicated with Mr. Bowling about directions to the latter's apartment. Mr. Grable then provided the directions to Mr. Bell. Using his father's car, Mr. Bell drove Mr. Grable and Mr. Smith to Mr. Bowling's apartment complex. After the car entered the parking lot of the complex, Mr. Bowling provided Mr. Grable directions to his unit. Mr. Bell remained in the car while Mr. Grable and Mr. Smith went upstairs to the apartment.

Mr. Bowling let Mr. Grable and Mr. Smith in when they arrived. He then led them to the balcony, where the marijuana lay on a table. The three men sat down and were joined by Maverick Manuel, who was staying with Mr. Bowling. Mr. Smith then asked for a scale. While Mr. Bowling went inside to get one, Mr. Smith stole the marijuana and left the apartment. Mr. Smith testified at trial that once he had taken the marijuana and left the apartment, he had accomplished his goal.

Mr. Grable did not know that Mr. Smith had departed, and therefore stayed in the apartment. When Mr. Bowling returned to the balcony, he noticed that Mr. Smith had taken the marijuana and told Mr. Grable, "Your homeboy left with the weed, so you can't leave until he comes back[.]" Mr. Grable responded that Mr.

Smith had probably gone to get money, but Mr. Bowling and Mr. Manuel reiterated that Mr. Smith had to return or they were "gonna do some shit to [Mr. Grable]."

Realizing he was cornered, Mr. Grable drew his gun and shot Mr. Bowling in the head and Mr. Manuel in the chest, killing both men. Mr. Grable's use of deadly force was several minutes after Mr. Smith left with the marijuana.

**2**

William Kinnard, Mr. Bowling's stepbrother and roommate, was also present at the apartment on the day of the incident. When Mr. Bowling let Mr. Grable and Mr. Smith into the apartment, Mr. Kinnard was in the kitchen washing his hands. Mr. Kinnard did not join the others on the balcony.

While in the kitchen, Mr. Kinnard saw Mr. Smith leave the apartment. Mr. Kinnard went to the bathroom and remained there. Mr. Kinnard then heard two gunshots. After Mr. Grable left the apartment, Mr. Kinnard called 911 and walked to the balcony, where he found the bodies of Messrs. Bowling and Manuel.

Neighbors in the building also heard the gunshots and Mr. Grable leaving the apartment. Two of the neighbors who lived below Mr. Bowling's apartment called 911 after hearing the gunfire and seeing blood dripping from Mr. Bowling's balcony.

**3**

After leaving Mr. Bowling's apartment, Mr. Smith returned to Mr. Bell's car without Mr. Grable. Mr. Smith and Mr. Bell

attempted to contact Mr. Grable multiple times to no avail. Uncertain where Mr. Grable was, the two men drove away from the apartment complex but then returned to find Mr. Grable running back to the car. The three men left the apartment complex and returned to the home of Mr. Grable's mother.

During the drive, Mr. Smith showed the others the marijuana he had stolen. Mr. Grable said he shot one of the two victims but later admitted to shooting both of them. Following the incident, Mr. Grable, Mr. Smith, and Mr. Bell recorded themselves smoking the marijuana that Mr. Smith had stolen.

**B**

A grand jury charged Mr. Grable with conspiracy to commit a robbery in violation of 18 U.S.C. § 1951(a) and (b) (Count 1), interfering with commerce by robbery in violation 18 U.S.C. §§ 1951(a) and (b) and 2 (Count 2), and using a firearm during and in relation to a crime of violence, namely the § 1951(a) robbery charged in Count 2 resulting in murder, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(j)(1), and 2 (Count 3). Mr. Grable pled not guilty to all charges and proceeded to a jury trial.

At the close of the government's case, Mr. Grable moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Focusing on the force requirement in § 1951(b)(1), Mr. Grable argued that the government failed to establish that force was used to accomplish the taking of the marijuana. Although he implicitly conceded that a theft had occurred, Mr. Grable asserted that the theft was complete when Mr. Smith surreptitiously took

the marijuana and left Mr. Bowling's apartment. As a result, there was no robbery.

Mr. Grable also argued that the force he used on the balcony after Mr. Smith departed with the marijuana was not in furtherance of the theft and was not premeditated. As to the conspiracy charge, Mr. Grable argued that the evidence showed an agreement to carry out a "buck," but not an agreement to use force to take the marijuana.

The district court denied the Rule 29 motion. The court concluded that a jury could find that there was a conspiracy, that the force was used in furtherance of a robbery, and that at least the second murder was premeditated. Mr. Grable later renewed his motion for judgment of acquittal, and the court again denied it.

The jury convicted Mr. Grable on all charges. As to Count 3, it found him guilty of first-degree premeditated murder, first-degree felony murder, and second-degree murder for the killings of Messrs. Bowling and Manuel.

Mr. Grable filed a post-trial motion for judgment of acquittal, again arguing that the government had failed to prove the requisite force necessary for a substantive § 1951(a) robbery. Specifically, he maintained that the language of the Hobbs Act required the taking to be by force or threat of force, and the evidence had only established that force was used after Mr. Smith's taking of the marijuana. And he asserted that the text of § 1951(b) did not contemplate that "force used to facilitate flight would convert a theft to a robbery." The district court denied the motion.

## C

Because of the nature of the offenses, the probation officer calculated the offense level for Counts 1 and 2 together and for Count 3 separately. The probation officer determined that Mr. Grable's total offense level under the Sentencing Guidelines was 43 as to Counts 1 and 2. This consisted of a base offense level of 43 and an enhancement of 2 levels for obstruction of justice pursuant to U.S.S.G. § 3C1.1, with the total offense level being capped at 43 in accordance with the Sentencing Guidelines. The base offense level for Count 3 was "the minimum term of imprisonment required by statute." The probation officer calculated Mr. Grable's criminal history category as I because he had no criminal history points.

As to Counts 1 and 2, which each carried a maximum term of imprisonment of 20 years, the probation officer recommended a guideline imprisonment range of life that was statutorily capped at 40 years. For Count 3—which carried a minimum term of imprisonment of 10 years and a maximum term of life imprisonment—the probation officer recommended a consecutive term of life imprisonment.

At the sentencing hearing, the parties raised objections and arguments regarding the appropriate sentence. As relevant here, the parties disputed what the applicable guideline imprisonment range would be for Mr. Grable's conviction on Count 3. Mr. Grable argued that 18 U.S.C. § 924(j) did not require that the term of imprisonment run consecutively and allowed the district court to

impose no additional term of imprisonment.  He alternatively argued that if the court applied the language of 18 U.S.C. § 924(c), the guideline imprisonment range would be 10 years to life imprisonment to run consecutively.  The government countered by asserting that a mandatory term of life applied to Count 3 pursuant to 18 U.S.C. § 1111.  And it argued that the Sentencing Guidelines would still mandate a term of life imprisonment for Count 3 were the court to not adopt its interpretation of § 1111.

The district court overruled Mr. Grable's objection and also declined to adopt the government's position.  It concluded that the applicable guideline imprisonment range for Count 3 was 10 years to life imprisonment.

The district court orally sentenced Mr. Grable to a term of imprisonment "consist[ing] of 240 months as to Count 1, 240 months as to Count 2, and a consecutive life sentence on Count 3." It also imposed a term of five years of supervised release.  The written judgment, however, memorialized the sentence as consisting of "a 240-month term as to Count 1, a 240-month term as to Count 2, and a [l]ife term as to Count 3, all such terms to run consecutively," as well as the five-year term of supervised release.[2]

---

[2] Normally, "[w]hen a sentence pronounced orally and unambiguously conflicts with the written order of judgment, the oral pronouncement governs." *United States v. Bates*, 213 F.3d 1336, 1340 (11th Cir. 2000).  *See also United States v. Mosley*, 31 F.4th 1332, 1335–36 (11th Cir. 2022) (remanding to the district court to "ensure its written judgment conform[ed] with its oral

## II

"We review challenges to the sufficiency of the evidence to support a conviction de novo, viewing the evidence and all reasonable inferences . . . in the light most favorable to the government." *United States v. Ochoa*, 941 F.3d 1074, 1102 n.18 (11th Cir. 2019) (quoting *United States v. Baldwin*, 774 F.3d 711, 721 (11th Cir. 2014)). We similarly "review[ ] the district court's interpretation and application of a statute de novo." *United States v. Ortega-Torres*, 174 F.3d 1199, 1200 (11th Cir. 1999).

## III

Mr. Grable does not challenge his conviction on Count 1 for Hobbs Act conspiracy. We therefore do not discuss that conviction further.

As to Count 2, Mr. Grable argues that the force required to commit robbery under 18 U.S.C. § 1951(a) must occur prior to or during the taking of property. He contends that the 1946 Congress, in passing the Hobbs Act, did not adopt the "modern" view of robbery, which prohibits the use of force to retain, carry away, or facilitate escape with the stolen property. Because he used force only after Mr. Smith surreptitiously stole the marijuana and carried it away from the apartment, Mr. Grable asserts that the government failed to prove that he violated § 1951(a). We agree and set aside

---

pronouncement"). But because we are setting aside the convictions on Counts 2 and 3, all that remains is the 20-year sentence on Count 1.

Mr. Grable's convictions on Count 2 and on Count 3 (which was premised on Count 2).

## A

In construing a statute we "begin with the text." *Lackey v. Stinnie*, 604 U.S. 192, 199 (2025). Courts "normally interpret[ ] a statute in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020). In general, however, "[s]tatutory definitions control the meaning of statutory words[.]" *Burgess v. United States*, 553 U.S. 134, 129–30 (2008) (internal quotation marks and citation omitted).

The Hobbs Act, 18 U.S.C. § 1951(a), reads in relevant part as follows:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

The Act defines "robbery" as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, *by means of* actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property . . . ." § 1951(b)(1) (emphasis added).

"The two required elements for a substantive Hobbs Act conviction are 'robbery and an effect on interstate commerce.'" *United States v. Taylor*, 480 F.3d 1025, 1026–27 (11th Cir. 2007) (alterations adopted) (quoting *United States v. Rodriguez*, 218 F.3d 1243, 1244 (11th Cir. 2000)). Our focus is on the robbery element. As explained below, we conclude that a Hobbs Act robbery is not committed where, as here, force or threat of force is used only after the property has been taken by surreptitious means and carried away.

Robbery under the Hobbs Act requires that the taking of property be done *"by means of* actual or threatened force, or violence, or fear of injury, immediate or future, to [the] person or property[.]" § 1951(b)(1) (emphasis added). The phrase "by means of," the Supreme Court has told us, "typically indicates that the given result (the 'end') is achieved, at least in part, *through* the specified action, instrument, or method (the 'means'), such that the connection between the two is something more than oblique, indirect, and incidental. In other words, not every but-for cause will do." *Loughrin v. United States*, 573 U.S. 351, 363 (2014) (addressing 18 U.S.C. § 1344(2) and citing dictionary definitions of the phrase). So for a taking of property to constitute a Hobbs Act robbery under §§ 1951(a) and 1951(b)(1), the theft must have been achieved, at least in part, through the use of actual or threatened force. *Cf. Scheidler v. Nat'l Org. for Women, Inc.*, 547 U.S. 9, 16 (2006) (holding that "physical violence unrelated to robbery or extortion falls outside the scope of the Hobbs Act").

12                    Opinion of the Court                    23-10544

Here Mr. Grable used force against Messrs. Bowling and Manuel only *after* Mr. Smith had surreptitiously taken the marijuana and left the apartment with it.  The theft of the marijuana therefore was not achieved, not even in part, through the use of ("by means of") force.  *See* § 1951(b)(1); *Loughrin*, 573 U.S. at 363.  Mr. Grable's shooting of the victims did not transform the earlier theft of the marijuana into a Hobbs Act robbery.

The government resists this conclusion by arguing that the theft was not complete at the time of the shooting because Mr. Grable personally had not gotten his hands on the marijuana that Mr. Smith had stolen.  But the government does not cite any authority to support its argument, and the common-law rule is that larceny is complete when the owner of the property is deprived of its possession.  *See, e.g., Crabb v. Zerbst*, 99 F.2d 562, 564 (5th Cir. 1938) (stating that the "felonious taking and carrying away of property . . . constitutes the common law offense of larceny"); *Robinson v. United States*, 143 F.2d 276, 278 (10th Cir. 1944) ("Larceny [at common law] is the felonious taking . . . and the carrying away of the personal property of another, without the latter's consent, and with the felonious intent permanently to deprive the owner of such property."); *Armour Packing Co. v. United States*, 153 F. 1, 5 (8th Cir. 1907) ("[T]he fact remains that the offense is complete where the felonious taking occurs[.]").

The government is likely right that the Hobbs Act conspiracy charged in Count 1 had not necessarily ended at the time of the fatal shootings.  *See generally United States v. Dynalectric Co.*, 859 F.2d

23-10544                 Opinion of the Court                    13

1559, 1564 (11th Cir. 1988) (explaining that a "conspiracy continues until the objectives of the conspiracy succeed or are abandoned and . . . to determine the objectives of any given conspiracy, the court must look to the conspiratorial agreement"). But a Hobbs Act conspiracy is not the same as a substantive Hobbs Act robbery. "Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes." *Iannelli v. United States*, 420 U.S. 770, 777 (1975).

Mr. Grable used force only after Mr. Smith had surreptitiously taken the marijuana and left the apartment with it. As a result, there was no robbery under the Hobbs Act. *See United States v. Smith*, 156 F.3d 1046, 1056 (10th Cir. 1998) (granting a judgment of acquittal on a § 1951(a) conviction because the defendants' use of force during an escape attempt was insufficient: "The fact that several employees followed Mr. Smith [the thief] into the parking lot, and that Mr. Dotson [one of the employees] was injured by the getaway car, does not support a finding that Mr. Smith took the guns [the property] by means of force or violence.").

**B**

Our conclusion, we think, is confirmed by the state of the law when the Hobbs Act became law in 1946. *See* Hobbs Anti-Racketeering Act of 1946, Pub. L. No. 79-486, 60 Stat. 420.

In the words of the Supreme Court, "[i]t is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Sekhar v. United States*, 570 U.S. 729, 732 (2013) (internal

quotation marks and citation omitted).  "At common law, robbery meant larceny *plus* force, violence, or putting in fear."  *Carter v. United States*, 530 U.S. 255, 275 (2000) (Ginsburg, J., dissenting).  And "[t]he crime of robbery [was] complete as soon as the robber unlawfully and by means of force or fear gain[ed] possession of the movable property of another in the presence of its lawful custodian and reduce[d] it to his manual possession."  2 Ronald A. Anderson, Wharton's Criminal Law & Procedure § 553 (1957).

At the time the Hobbs Act was enacted, Black's Law Dictionary defined "robbery" as the "[f]elonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, *accomplished by means of force or fear*."  Black's Law Dictionary 1565 (3d ed. 1933) (emphasis added).  It further explained that "[w]here a person, either with violence or with threats of injury, and putting the person robbed in fear, takes and carries away a thing which is on the body, or in the immediate presence of the person from whom it is taken, under such circumstances that, *in the absence of violence or threats, the act committed would be a theft*."  *Id.* at 1566 (emphasis added).  *See also* Black's Law Dictionary 1492 (4th rev. ed. 1968) ("Robbery may thus be said to be a compound larceny, composed of the crime of larceny from the person with the aggravation of force, actual or constructive, *used in the taking*.") (emphasis added).  Thus, without prior or contemporaneous "violence or threats," the act would simply be a theft or larceny and not a robbery.  In other words, force used only after the taking, such as to retain property or to facilitate an escape, did not make a larceny a common law robbery.  *See* Anderson,

23-10544               Opinion of the Court                    15

Wharton's Criminal Law & Procedure, at §§ 554, 559–60; 2 Jens David Ohlin, Wharton's Criminal Law § 31:10 (16th ed. & Sept. 2025 update); 3 Wayne LaFave, Substantive Criminal Law § 20.3(e) (3d ed. 2018); Model Penal Code § 222.1, Part II Commentaries, cmt. 2(b), at 104 n.23 (A.L.I. 1980).

In 1946, the year of the Hobbs Act's enactment, we reiterated this common-law understanding of robbery in *Norris v. United States*, 152 F.2d 808 (5th Cir. 1946). There, we noted that "[r]obbery in its usual and ordinary sense . . . means the felonious taking of property from the person of another by violence or by putting him in fear." *Id.* at 809. And we explained that "[t]he taking must be by violence or putting [the victim] in fear . . . . The violence or putting in fear must be at the time of the act or immediately preceding it." *Id.*

Today, many jurisdictions have shifted away from the common law's temporal understanding of the use of force to a "modern" view that captures any force used before, during, or after the theft is committed. Namely, "a majority of states have departed from the common law definition of robbery, broadening it, either statutorily or by judicial fiat, to . . . include[ ] conduct where the initial use or threat of force occurs in flight after the attempt or commission of the theft[.]" *United States v. Jones*, 878 F.3d 10, 18–19 (2d Cir. 2017) (alterations adopted and citations and internal quotation marks omitted). For example, under Alabama's current criminal code, robbery "embraces acts which occur in an attempt to commit or the commission of theft, or in immediate flight after

the attempt or commission." Ala. Code § 13A-8-40(b). Similarly, Florida's current robbery statute encompasses acts that "occur[ ] either prior to, contemporaneous with, or subsequent to the taking of the property," so long as the act and the taking "constitute a continuous series of acts or events." Fla. Stat. § 812.13(3)(b). *See also* §§ 812.13(2)(a) & (3)(a) (criminalizing acts that "occur[ ] in an attempt to commit robbery or in flight after the attempt or commission" where the "offender carried a firearm or other deadly weapon").

The Model Penal Code, enacted in 1962—16 years after the Hobbs Act became law—sets out the modern view of robbery to include uses of force that "occur[ ] in an attempt to commit theft or in flight after the attempt or commission." Model Penal Code § 222.1 (defining "in the course of committing a theft"). Under the Model Penal Code's view, "a robbery is committed if the required special circumstances exist at any point from the beginning of an attempt to commit a theft through the end of the flight following its attempt or commission." Model Penal Code § 222.1, Part II Commentaries, cmt. 2, at 99. *See also id.* cmt. 2(b), at 104. Thus, the Model Code "represents a broader conception of the offense than previously existed in many states." *Id.* introductory note, at 95.

The modern understanding of robbery, however, was not the prevalent view in 1946, when Congress enacted the Hobbs Act. *See id.* cmt. 2(b), at 104 ("Prior law was in general narrower than the Model Code on this point and did not include force during

flight within the offense of robbery. [Those] [s]tatutes . . . were most likely to be interpreted to exclude flight after the taking."). At that time the common-law view was the majority view, and as a result we cannot say that §§ 1951(a) and 1951(b)(1) incorporated the modern view. *See Daker v. Comm'r, Ga. Dep't of Corr.*, 820 F.3d 1278, 1286 (11th Cir. 2016) ("We must interpret the statute that Congress enacted, not rewrite the text to match our intuitions about unstated congressional purposes.").

## C

We address two additional arguments made by the government. Neither one is persuasive.

First, the government seeks to analogize Hobbs Act robbery to bank robbery under 18 U.S.C. § 2113(a). Because bank robbery "continues throughout the escape for purposes of characterizing the involvement of additional parties who knowingly and willfully join in the escape phase only," *United States v. Willis*, 559 F.2d 443, 444 n.5 (5th Cir. 1977), the government asserts that Mr. Grable's shooting of Messrs. Bowling and Manuel to facilitate his escape was part and parcel of a Hobbs Act robbery.

The analogy, though superficially appealing, does not work. As noted earlier, the Tenth Circuit has held that force used only in an escape attempt is insufficient to make a larceny a Hobbs Act

robbery.  *See Smith*, 156 F.3d at 1055–56.  And we agree with its analysis.[3]

Second, the government cites to *United States v. Garcia-Caraveo*, 586 F.3d 1230, 1236 (10th Cir. 2009), for the proposition that the modern view of robbery "is not necessarily inconsistent with the common-law theory of robbery" because a "thief who finds it necessary to use force or threatened force after a taking of property . . . may in legal contemplation be viewed as one who never has the requisite dominion and control of the property to qualify as a 'possessor.'"  But *Garcia-Caraveo* did not involve a Hobbs Act robbery, as the issue there was whether a California robbery conviction constituted a "crime of violence" under U.S.S.G. § 2L1.2(b)(1)(A)(ii).  *See* 586 F.3d at 1232.  Moreover, the Tenth Circuit in that case recognized that "[a]t common law . . . robbery occurred only when the perpetrator used force or intimidation *before or during* the taking itself; force used to retain the property or to escape did not suffice to transform larceny into robbery."  *Id.* at 1233.  And, as discussed above, the Tenth Circuit has held that force used only in an attempt to escape does not make larceny a Hobbs Act robbery.  *See Smith*, 156 F.3d at 1056.

We therefore reverse Mr. Grable's convictions on Counts 2 and 3.

---

[3] In addition, Mr. Grable was in on the venture to steal the marijuana from the beginning.  Because he was not a person who only joined the escape phase of the scheme, the bank robbery analogy is inapt.

23-10544                Opinion of the Court                    19

## IV

Mr. Grable raises two sentencing issues on appeal. First, he challenges his consecutive terms of imprisonment under 18 U.S.C. §§ 924(c)(1)(A)(iii) and 924(j)(1) in light of *Lora v. United States*, 599 U.S. 453 (2023). Second, he argues that aiding and abetting a Hobbs Act robbery is not a predicate crime of violence under § 924(c).

We need not pass on these issues today. Because we set aside Mr. Grable's convictions on Counts 2 and 3, his sentences on those convictions are necessarily vacated. Mr. Grable's sentence on Count 2 is vacated because he did not commit a Hobbs Act robbery. And his Count 3 conviction is vacated because the predicate offense that Count 3 relied on was the Hobbs Act robbery charged in Count 2.[4]

## V

We set aside Mr. Grable's convictions on Counts 2 and 3 due to insufficient evidence and vacate his sentences on those convictions.

---

[4] Mr. Grable's conviction and sentence on Count 3 cannot be sustained on an aiding and abetting theory. As the parties note, aiding and abetting a Hobbs Act robbery is a crime of violence for purposes of § 924(c) under our precedent. *See United States v. Wiley*, 78 F.4th 1355, 1363 (11th Cir. 2023). But to sustain a conviction on an aiding and abetting theory, the government must prove beyond a reasonable doubt that someone committed the principal crime—here the Hobbs Act robbery—and it has failed to do so. *See id.* at 1364 ("To obtain a conviction for aiding and abetting, the government must prove, among other things, that someone committed the substantive offense.").

Mr. Grable's 20-year sentence on Count 1 stands.  We remand for the district court to correct the judgment in accordance with our opinion.

**REVERSED IN PART, VACATED IN PART, AND REMANDED.**