UNITED STATES of America, Plaintiff–Appellee,

v.

Robert Melvin HARRIS, Defendant–Appellant.

No. 92–5603.

United States Court of Appeals, Fourth Circuit.

Argued April 2, 1993.

Decided June 14, 1993.

Denise Charlotte Barrett, Federal Public Defender's Office, Baltimore, MD, argued (James K. Bredar, Federal Public Defender, Denise Benvenga, Asst. Federal Public Defender, on brief), for defendant-appellant.

Ethan L. Bauman, Asst. U.S. Atty., Baltimore, MD, argued (Richard D. Bennett, U.S. Atty., on brief), for plaintiff-appellee.

Before NIEMEYER and WILLIAMS, Circuit Judges, and SPROUSE, Senior Circuit Judge.

## OPINION

SPROUSE, Senior Circuit Judge:

The sole issue presented is whether the district court erred in excluding the proffered testimony of the defendant's expert witness concerning psychological limitations on eyewitness identification. We affirm.

### I

A man wielding a long-bladed knife robbed a branch of the Bank of Maryland in Annapolis on the afternoon of February 5, 1992. Robert M. Harris, the defendant, admitted that he had been in the bank twice the morning of February 5. He denied, however, robbing the bank or being in the bank that afternoon.

The evidence at trial established that there were three eyewitnesses to the robbery: Christine Dean, a bank teller; Jeffrey White, a bank teller; and Charlene Watkins, a branch manager. Although immediately after the robbery all three witnesses recalled seeing Harris only once on the morning of February 5, they later testified that Harris was in the bank twice that morning. At 10:00 a.m. on February 5, Harris approached White at his teller station and inquired about opening an account. White and Watkins, who was training White at the time, provided Harris with information on account costs, and after examining a savings accounts display, Harris left the bank. He returned at around 11:00 a.m. This time, White directed Harris

to the new accounts desk where he spoke with Watkins, who gave him an application to open an account. According to their testimonies, both Dean and White observed Watkins's interaction with Harris and overheard their conversation. The work station of the tellers is located approximately eight feet from the new accounts desk in the bank lobby.

At about 2:40 p.m., a black male, later identified as Harris, entered the bank and approached Watkins in the lobby. Watkins asked him, "You did not bring the paperwork back?" After the man responded, "No," the two went to the new accounts desk to complete the savings account application. Dean and White, standing at their teller stations, testified at trial that they also overheard this conversation between Watkins and the man. While this man was completing the application, Watkins went to her office, which opened up to the teller stations, for a telephone call. White went to the back of the bank to close up for the day. At approximately 3:00 p.m., this same man approached Dean at her teller station, pushed a chef's hat to her, and demanded, "put all the money in the bag." He threatened her with a long-bladed knife and ordered her to comply immediately with his demand. Watkins overheard the demand but White did not. Dean complied with the request, giving the robber approximately $3,400.

The bank's surveillance camera photographed Harris sitting at the accounts desk at 11:40 a.m., but the photograph did not show his face. A second photograph, taken at 3:00 p.m., showed the robber's profile as he sat at this same desk with Watkins. The FBI identified Harris as a suspect and eight days after the robbery, presented to the eyewitnesses a six-person photospread from which Watkins and White identified Harris as the robber. Watkins claimed she was 100% positive in her identification from these photos, and White declared he was 80% confident. Dean could not identify the robber from the photospread.

Harris was indicted in late February 1992. At his first trial in May 1992, the jury was unable to reach a verdict. Harris was retried a week later. At the beginning of the

second trial and after a jury had been chosen, Harris's counsel advised the court that it wished to call Dr. John C. Brigham, an expert witness on the reliability of eyewitness identification, to discredit Dean's, White's, and Watkins's testimonies. After a proffer, the district court refused to admit the evidence. It found that the expert testimony would not be helpful to the jury as required by Federal Rule of Evidence 702. The court was of the opinion that under these circumstances Harris's identification was not truly at issue. It also ruled that even if the eyewitness testimony created issues of credibility, the jury could resolve them without an expert's assistance. At trial, Dean, White, and Watkins testified, and all identified Harris as the robber through his looks, demeanor, and voice.[1] On May 28, 1992, the jury found Harris guilty of armed bank robbery in violation of 18 U.S.C. § 2113(d). Harris moved for a new trial, challenging the district court's exclusion of his expert's testimony. The court denied this motion relying on its original reasoning and further declared the evidence inadmissible because its prejudicial effect outweighed its probative value under Federal Rule of Evidence 403. The district court subsequently sentenced Harris to seventy months' confinement. Harris appeals.

## II

■ Harris's only assertion of error is the district court's exclusion of his expert's testimony on the reliability of eyewitness identification. The expert would have testified, among other things, that the memories of Dean, White, and Watkins were unreliable because: (1) they discussed the bank robbery among themselves, and these discussions could have strengthened their misidentifications and their confidence in these identifications; (2) the stress of the bank robbery could have clouded their memories; (3) Harris had been in the bank two times earlier on the day of the robbery, they could have transposed the shape of his face or his other general features to the robber's; and (4)

their memories could have been distorted over time.

■ Federal Rule of Evidence 702 sets the standard for the admissibility of expert testimony. It provides that

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. As Rule 702 indicates, expert testimony is only permitted if it assists the trier of fact to understand evidence or to determine a fact in issue. *Persinger v. Norfolk & W. Ry.*, 920 F.2d 1185, 1188 (4th Cir.1990). The exclusion of expert testimony under Rule 702 is within the sound discretion of the trial judge. *Sparks v. Gilley Trucking Co.*, 992 F.2d 50, 53 n. 3 (4th Cir.1993). Exercising its discretion, the court should consider whether the testimony is within the common knowledge of the jurors. *See Persinger*, 920 F.2d at 1188. This type of evidence, almost by definition, can be of no assistance to a jury. *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055 (4th Cir.1986).

Until fairly recently, most, if not all, courts excluded expert psychological testimony on the validity of eyewitness identification. *See, e.g., United States v. Thevis*, 665 F.2d 616, 641 (5th Cir.), *cert. denied*, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982); *United States v. Amaral*, 488 F.2d 1148, 1152–53 (9th Cir.1973). But, there has been a trend in recent years to allow such testimony under circumstances described as "narrow." *See United States v. Downing*, 753 F.2d 1224, 1231 (3d Cir.1985) (citing *People v. McDonald*, 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709 (1984)). Most courts allowing such expert testimony, however, recognize that the ultimate determination of admissibility, as with most Rule 702 evaluations, rests within the sound discretion of the trial court. *See United States v. Stevens*, 935 F.2d 1380, 1400–01 (3d Cir.1991); *State v. Chapple*, 135

---

1. Both Dean and Watkins testified that Harris was a black man with a round face, approximately 5′ 6″ to 6′ tall. All three eyewitnesses further testified that Harris wore a jacket on the morn-

ing of the robbery and that when he returned to the bank in the afternoon, he wore a long, dark overcoat.

Ariz. 281, 296, 660 P.2d 1208, 1223 (1983) (en banc); *People v. McDonald*, 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709, 724–25 (Cal. 1984). *But see United States v. Holloway*, 971 F.2d 675, 679 (11th Cir.1992) (declaring expert testimony on eyewitness identification per se inadmissible), *cert. denied*, — U.S. ——, 113 S.Ct. 1390, 122 L.Ed.2d 764 (1993). The narrow circumstances held sufficient to support the introduction of expert testimony have varied but have included such problems as cross-racial identification, identification after a long delay, identification after observation under stress, and psychological phenomena as the feedback factor and unconscious transference.[2] *See Stevens*, 935 F.2d at 1400 (admitting testimony on the lack of correlation between confidence and accuracy in eyewitness identification); *United States v. Sebetich*, 776 F.2d 412, 418–19 (3rd Cir.1985) (holding erroneous the exclusion of expert testimony where the identification came nineteen months after the robbery, it was made under stressful circumstances, and it was only derived from one person's testimony), *cert. denied*, 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988); *United States v. Smith*, 736 F.2d 1103, 1106 (6th Cir.) (determining that the jury could be helped by testimony on: the unconscious transference between a photospread three weeks after the robbery and a line-up four months after the robbery, stress and weapons at the bank, and cross-racial transference), *cert. denied*, 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984); *Chapple*, 660 P.2d at 1219–24 (admitting testimony on witness confidence, the feedback factor, the memory process, stress, and unconscious transference where the facts were

close). Outside of such narrowly constrained circumstances, jurors using common sense and their faculties of observation can judge the credibility of an eyewitness identification, especially since deficiencies or inconsistencies in an eyewitness's testimony can be brought out with skillful cross-examination. *See United States v. Curry*, 977 F.2d 1042, 1052 (7th Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 1357, 122 L.Ed.2d 737 (1993); *United States v. Christophe*, 833 F.2d 1296, 1300 (9th Cir.1987).

These narrow circumstances such as described in *United States v. Downing*,[3] 753 F.2d 1224 (3d Cir.1985), were not present in the case *sub judice*. Even though Harris's proffer included most of the common justifications recognized as supporting the admission of such expert testimony, the facts simply do not support his argument that the identification was suspect. The commonly encountered problem in identifying a robber involves one identification, by one witness, under stress. *See, e.g., Sebetich*, 776 F.2d at 419; *cf. Smith*, 736 F.2d at 1107. In contrast, the jury here could pick and choose from an evidentiary cornucopia. There was not one eyewitness here, but three. The identification did not result from one observation on one occasion, but from three identifications on three separate occasions. Harris even admitted that he was in the bank on two occasions on the date of the robbery. On that day, Dean, White, and Watkins all observed Harris face-to-face. Dean and Watkins identified Harris not only by his physical appearance, but they testified that the voice of the man with a knife at the teller window

**2.** The feedback factor demonstrates "that witnesses who discuss the case with each other may unconsciously reinforce mistaken identifications" and their certainty in these identifications. *United States v. Moore*, 786 F.2d 1308, 1311 (5th Cir.1986); *Chapple*, 660 P.2d at 1221. Unconscious transference occurs when a witness confuses a person seen in one situation with someone seen in a different situation. *Chapple*, 660 P.2d at 1221.

**3.** In *Downing*, the Third Circuit reversed the district court's ruling that expert testimony on the reliability of eyewitness identification was per se inadmissible. The *Downing* court declared that under certain narrow circumstances, similar to those we have identified above, "expert testi-

mony on the reliability of eyewitness identifications can assist the jury in reaching a correct decision and therefore may meet the helpfulness requirements of Rule 702." *United States v. Downing*, 753 F.2d 1224, 1231 (3d Cir.1985). Further, the court declared that the admission of expert testimony depended on whether it was sufficiently tied to the facts of the case. *Id.* at 1242. In this fit, the *Downing* court emphasized that the offer of proof should establish the presence of factors, such as stress or differences in races, that have impaired the reliability of the eyewitness identification at issue. *Id.* at 1242. The court concluded that a trial court always retains discretion to exclude such testimony under Federal Rule of Evidence 403.

was the same voice as the man who, at 10:00 a.m., had approached White and Watkins at the teller station; at 11:00 a.m., had approached White at the teller station and Watkins in the lobby conversing with each of them; at 2:40 p.m., had returned to the bank and talked with Watkins a third time; and at 3:00 p.m., had demanded money from Dean. All of these identifications happened over five to twenty minute intervals, and none occurred under circumstances that could be deemed stressful, except Dean's confrontation with the robber. Race did not play a role in these identifications—while Harris is black, Watkins is also black, and her testimony was almost identical to that of Dean and White. Further supporting evidence included the identification of Harris by Watkins and White from an FBI six-person photospread eight days after the robbery. The government also submitted the surveillance photograph of the robber and the arrest photograph to the jury for its comparison with the defendant's in-court appearance. At trial, all three eyewitnesses examined the surveillance photograph of the man sitting at the desk before the robbery and identified him as Harris, the man who visited the bank two times earlier that day.

Finally, any discrepancies in these testimonies were brought out or could have been brought out on cross-examination. *See Curry*, 977 F.2d at 1052. Defense counsel attempted to reveal inaccuracies in the three witnesses' testimonies on cross-examination by probing into the witnesses' discussions among themselves regarding the robbery, challenging their descriptions of the robber compared with their descriptions of Harris, attacking their confidence in their photospread identifications, and pointing out other inconsistencies in their recollections.[4] For these same reasons, we affirm the district court's denial of Harris's motion for a new trial.

4. Even if the circumstances had matched the *Downing* pattern, defense counsel's advice and presentation to the court on the first day of trial hardly gave the government adequate notice of his intention to use an expert witness. *See Curry*, 977 F.2d at 1052 (notice of the proposed proffer of expert testimony given four days before trial

In view of the above, the judgment of the district court is affirmed.

*AFFIRMED.*

was prejudicial to the government and would have justified its exclusion); *United States v. Dowling*, 855 F.2d 114, 118 (3d Cir.1988) (notice of the proposed proffer of expert testimony given five days before trial was considered prejudicial to the government), *aff'd on other grounds*, 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990).