**UNITED STATES of America**

**v.**

**Cornelius Wayne LESTER**

**No. CR. 3:02CR372.**

United States District Court, E.D. Virginia, Richmond Division.

Dec. 19, 2002.

Shannon L. Taylor, Esquire, Special United States Assistant Attorney, United States Attorney's Office, Richmond, VA, for Government.

Robert J. Wagner, Esquire, Office of the Public Defender, Richmond, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

The United States has charged Cornelius Lester with interference with commerce by force in violation of 18 U.S.C. § 1951, and possession and discharge of a firearm in furtherance of a crime of violence in connection with the attempted robbery of a small convenience market in Richmond, Virginia. The case against Lester rests largely on the identification testimony of two eyewitnesses to the crime who separately identified Lester approximately six weeks after the crime in a photospread prepared an agent of the Bureau of Alcohol, Tobacco and Firearms ("ATF"), Melissa Merola, after ATF assumed jurisdiction of the case from the Richmond Police Department.

Lester filed a motion in limine seeking permission to admit expert testimony in support of a motion to suppress the identifications because the photospread used in the identification process allegedly was suggestive. The motion to suppress was denied for reasons set forth on the record on December 11, 2002. Thereafter, Lester's counsel made an oral motion seeking permission to offer at trial testimony respecting the various factors present in this case that might affect the reliability of the eyewitnesses' testimony.

## STATEMENT OF FACTS

Sang Foo Yoon owns the Golden Market store located at the corner of Chestnut and 3rd Streets in the City of Richmond. On August 10, 2002, an armed man attempted to rob the store, and in the process, shot Yoon in the hand. Yoon and one of his employees, Roberta Schwartz, later identified the assailant as the defendant, Cornelius Lester.

A full explication of the details surrounding the attempted robbery is not necessary in resolving the present motion. However, a brief description of the crime and the anticipated evidence is helpful in understanding the usefulness of the expert testimony that Lester wishes to introduce at trial.

During the daylight hours of August 10, 2002, Yoon was working behind the cashier counter with Schwartz. While Yoon was helping a man at the checkout counter, a black male walked into the store, proceeded to the counter, where he stood behind the man being helped, then pulled out a handgun, pushed the man at the counter to the ground, and demanded that Yoon turn over the money in the store. Yoon did not comply with the robber's demand and, instead, attempted to duck behind the counter, at which point, the robber fired two shots and then fled. One of the shots struck Yoon in the left hand. At the time of the attempted robbery, three or four customers were in the store. The store is equipped with video surveillance cameras, but they were not functioning at the time of the offense.

Richmond Police Officers arrived at the scene of the crime shortly thereafter, and commenced their investigation. The responding officers found no physical evidence at the scene; and, initially, only Schwartz and another customer in the store were able to provide any information about the appearance of the perpetrator. The description was quite vague: black skin and a short afro, between the age of

35 and 40, wearing a grey shirt and dark jean shorts. Yoon could not give a good description of the robber, but told the responding officer that he recognized the man as someone who previously had been in the store. Schwartz confirmed Yoon's assertion on that point.

Several days later, a customer advised Yoon and Schwartz that the man who had committed the robbery was named "Neil." On September 4, 2002, ATF investigators took over the investigation, and, on that date, solicited a more precise definition of the perpetrator from Schwartz, who told inspectors that she recalled the assailant as being approximately 6'1" tall, weighing about 180 pounds, aged in the mid–40s, and wearing shorts and a blue short-sleeved shirt at the time of the attempted robbery. Schwartz also conveyed her belief that the assailant was a regular customer of the market whose name was Neil. Investigators also obtained a description from Yoon, who speaks and understands limited English. Translation during the interview was provided by Yoon's daughter. Yoon described the perpetrator as a skinny black male, approximately 5'6" tall, wearing black pants and a black T-shirt. Yoon further told officers that he had seen the robber steal a beer from the store earlier in the day on August 10, and that he believed that the robber came into the store two to three times a week.

Based on this information, police began to suspect that the perpetrator might be Lester. Investigators went to Lester's home on September 19, 2002, where they obtained from Lester relevant identifying information. Based on that information, investigators obtained a booking photo of Lester from an earlier arrest and using the identifying data about Lester, ATF Agent Morella identified five other individuals whose characteristics resembled those of Lester. Morella then made a photo-spread by using the booking photographs of those five people and Lester.

On September 25, 2002, Morella and her partner returned to the Golden Market with the photospread and showed it to Schwartz, who, with 100% confidence, identified Lester as the robber. On September 30, 2002, investigators showed the photospread to Yoon who likewise thought Lester was the perpetrator but was somewhat uncertain because the facial fullness of Lester in the photospread was different than that of the robber. Yoon's daughter then reminded him that the photograph was made earlier in time. Yoon then asked to view the photospread again. This time he identified Lester with 90% confidence. Shortly thereafter, federal agents arrested Lester and searched his home. The agents recovered no incriminating evidence and Lester has made no statements.

On November 22, 2002, Lester moved to suppress any identification testimony by Yoon and Schwartz, asserting that the pretrial identification procedures were unduly suggestive, and that any in-court identification testimony by either Yoon or Schwartz would be unreliable. In support of that motion, Lester sought to admit the testimony of Dr. Brian Cutler as an expert in the field of eyewitness memory. At the hearing on December 11, 2002, the Court allowed Dr. Cutler to testify as an expert in the field of photospread identification procedures. Having heard Dr. Cutler's testimony and that of the other witnesses in the case, the Court determined that the photospread identification procedures that the police used in soliciting identifications from both eyewitnesses were not suggestive and, therefore, denied the motion to suppress.

After the Court ruled on the motion to suppress, Lester made an oral motion in limine requesting that the Court allow Dr. Cutler to testify at trial respecting the

general reliability of eyewitness identification. The United States opposed the motion, thereby necessitating a hearing on whether the proposed testimony of Dr. Cutler met the requirements of Fed. R.Evid. 702 as explained in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). With the consent of both parties, the Court then held the *Daubert* hearing without any additional briefing.

## DISCUSSION

Under Federal Rule of Evidence 702, "scientific, technical, or otherwise specialized knowledge" is admissible if it "will assist the trier of fact to understand the evidence or determine a fact in issue." Under Rule 702, a trial judge may not admit expert scientific testimony unless the proffered scientific evidence is both relevant and reliable, and its evidentiary reliability is based on scientific validity. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert*, the Supreme Court set forth a two-part test governing the admission of expert testimony: "(1) the expert testimony must consist of 'scientific knowledge'—that is, the testimony must be supported by appropriate validation; *and* (2) the evidence or testimony must 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *United States v. Dorsey*, 45 F.3d 809, 813 (4th Cir.1995) (quoting *Daubert*, 509 U.S. at 590–91, 113 S.Ct. 2786). In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court held that trial courts are to apply the requirements of *Daubert* in considering whether to admit expert testimony in non-scientific fields as well.

In *Daubert*, the Supreme Court identified four factors that trial courts should consider when evaluating the reliability prong of *Daubert/Kumho:*

(1) Whether the theory or technique used by the expert can be, and has been, tested;

(2) Whether the theory or technique has been subjected to peer review and publication;

(3) The known or potential rate of error of the method used; and

(4) The degree of the method's or conclusion's acceptance within the relevant scientific community.

*See* 509 U.S. at 593–94, 113 S.Ct. 2786.

Application of these factors to the proffered testimony is accomplished to ensure that expert evidence "rests on a reliable foundation." *See id.* Where the proponent of the testimony fails to present enough evidence to demonstrate to the court the scientific validity of the research supporting the expert's conclusions, the trial court cannot determine whether the testimony is well-founded. Consequently, the proponent bears a significant burden in proving reliability: "[I]t is not enough that a proffer of expert testimony include the substantive areas of the proposed testimony. A proffer must also include sufficient information regarding the bases for the expert's opinion." *United States v. Jordan*, 924 F.Supp. 443, 447 (W.D.N.Y. 1996); *see also United States v. Brien*, 59 F.3d 274, 277–78 (1st Cir.1995); *United States v. Rincon*, 28 F.3d 921, 924–25 (9th Cir.1994).

In deciding whether proffered scientific evidence satisfies the second *Daubert* prong—*i.e.*, whether it will assist the trier of fact—trial courts must be mindful of both the potential for expert testimony to mislead a jury, and the court's continuing obligation under Rule 403 to exclude evi-

dence, the probative value of which is substantially outweighed by the danger of confusing the jury. *See Dorsey,* 45 F.3d at 813. The added caution is necessary because expert testimony often carries a certain aura that might lead a jury to attach more significance to the testimony than is reasonably warranted. "Because of this risk," held the Supreme Court in *Daubert,* "the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." 509 U.S. at 595, 113 S.Ct. 2786. A trial court judge, therefore, may exclude reliable scientific evidence, if the court concludes that the risk of confusing the jury is too great. As the Supreme Court explained in *Daubert:*

> We recognize that in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That nevertheless, is the balance that is struck by the Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.

509 U.S. at 597, 113 S.Ct. 2786. Cognizant of the balance struck in *Daubert,* the Fourth Circuit has established the following benchmark to aid the trial courts in determining whether reliable scientific evidence will actually assist the jury: "[I]n determining whether a particular expert's testimony is sufficiently helpful to the trier of fact to warrant admission into trial, the district court should consider whether the testimony presented is simply reiterating facts already 'within the common knowledge' of the jurors." *Dorsey,* 45 F.3d at 814 (quoting *United States v. Harris,* 995 F.2d 532, 534 (4th Cir.1993)).

In considering proffers of expert testimony on the validity of eyewitness identification, the second prong of *Daubert* is particularly relevant. In *Harris,* the Fourth Circuit noted that such testimony is appropriate only in a narrow range of circumstances. *See Harris,* 995 F.2d at 535. In *Harris,* the Fourth Circuit explained that,

> [u]ntil fairly recently, most, if not all, courts excluded expert psychological testimony on the validity of eyewitness identification. But, there has been a trend in recent years to allow such testimony under circumstances described as "narrow." ... The narrow circumstances held sufficient to support the introduction of expert testimony have varied but have included such problems as cross-racial identification, identification after a long delay, identification after observation under stress, and psychological phenomena as the feedback factor and unconscious transference.

*Id.* at 534–35 (internal citations omitted). Outside of narrow circumstances such as these, expert testimony respecting the credibility of eyewitnesses adds little to the common sense of the jury. *See id.*

In the present case, Lester seeks to admit the testimony of Dr. Brian Cutler, a well-qualified social psychologist with a fairly impressive record of research and publication in the field of eyewitness identification. In addition to his own research, Dr. Cutler is familiar with the work of others in the field; he has testified as an expert in eyewitness identification in criminal matters on approximately fifteen occasions; and he has testified before a jury in such matters on four occasions. If allowed to testify at trial in this case, he would explain that certain factors attending the eyewitness testimony in this case might affect the jury's assessment of the reliability of that testimony. Specifically, he would testify as to the lack of correlation between an eyewitness' confidence about

an identification, and the accuracy of that identification; the problem of cross-race identification; the problems associated with identification after a long delay; the phenomenon of weapon focus; the effect of stress on identification; and the phenomenon of unconscious transference.

Dr. Cutler's testimony, therefore, if found to be reliable, would fall within the narrow range of circumstances identified in *Harris*, under which a jury might benefit from expert testimony on eyewitness reliability. *See* 995 F.2d at 535. Indeed, the Court recognizes that, under the unique facts pertaining to the eyewitness identification in this case, such testimony might well be relevant. Specifically, the case against Lester rests almost exclusively on the testimony of two eyewitnesses, each of whom is a different race from the perpetrator, and each of whom saw the perpetrator under stressful circumstances involving the discharge of a firearm. It is, therefore, highly likely that the credibility of the eyewitnesses' testimony in the eyes of the jury will determine Lester's guilt or innocence. The subjects about which Dr. Cutler proposes to testify might prove useful to the jury in assessing credibility.

However, notwithstanding the potential probative value of Dr. Cutler's testimony, his proffer of testimony suffers from serious defects under the first *Daubert* prong. As previously noted, Dr. Cutler seems to be well-qualified in the field of eyewitness identification, and quite familiar with the work of others in the field. At the *Daubert* hearing, Dr. Cutler testified in the broadest terms about the conclusions he has drawn about the various problem areas associated with eyewitness identification. Notably lacking from Dr. Cutler's testimony, however, was any detailed explanation of the research he relies upon in coming to his various conclusions. The Court, therefore, is at a loss in assessing whether Dr. Cutler's conclusions have any scientific validity.

The insufficiency of Dr. Cutler's proffer is quite apparent when compared against the proffer of the expert in *Jordan*. *See* 924 F.Supp. at 447–48. In *Jordan*, as in this case a criminal defendant sought to introduce expert testimony addressing the problems associated with eyewitness testimony, including many of the same problems about which Dr. Cutler would testify. *See id.* at 448. The expert in *Jordan*, unlike Dr. Cutler in this case, backed up her conclusions with an extensive discussion at the *voir dire* hearing about the various studies that supported her findings. With a wide array of hard scientific data demonstrating the bases for the expert's opinions, the court determined that those opinions were based on scientific knowledge and allowed the expert to testify at trial. *See id.*

In sum, Dr. Cutler simply did not demonstrate how he came by his conclusions. He stated that his own studies were the product of the scientific method, had been subjected to peer review, and contained identifiable error rates. He stated further that his conclusions are generally accepted in his field. However, talismanic, conclusory recitation of the *Daubert* factors is not sufficient proof of scientific validity. To permit an expert to testify based upon such a *pro forma* proffer would be to eschew entirely the Court's gatekeeping role under Rule 702, as explained in *Daubert*. Dr. Cutler was required to show his work, so to speak, and he did not. In the absence of any evidence respecting the scientific foundation for his opinions, the Court cannot conclude that Dr. Cutler's proffered testimony is scientifically reliable.

For the foregoing reasons, it is hereby ORDERED that the Defendant's motion

in limine to admit the testimony of Dr. Brian Cutler at trial is DENIED.

The Clerk is directed to send a copy of this Order to all counsel of record.

It is so ORDERED.