**UNITED STATES of America**

v.

**Cornelius Wayne LESTER**

No. CR. 3:02CR372.

United States District Court,
E.D. Virginia,
Richmond Division.

March 18, 2003.

Shannon L. Taylor, Esquire, Special United States Assistant Attorney, United

States Attorney's Office, Richmond, for Government.

Mary E. Maquire, Esquire, Office of the Public Defender, Richmond, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

The United States has charged Cornelius Lester with interference with commerce by force in violation of 18 U.S.C. § 1951, and possession and discharge of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii), in connection with the attempted robbery of a small convenience market in Richmond, Virginia. The case against Lester rests almost entirely on the identification testimony of two eyewitnesses to the crime who separately identified Lester approximately six weeks after the crime in a photospread prepared by an agent of the Bureau of Alcohol, Tobacco and Firearms ("ATF"), Melissa Merola, after ATF assumed jurisdiction of the case from the Richmond Police Department.

Lester filed a motion in limine seeking permission to admit expert testimony in support of a motion to suppress the identifications because the photospread used in the identification process allegedly was suggestive. The motion to suppress was denied for reasons set forth on the record on December 11, 2002. Thereafter, Lester's counsel made an oral motion seeking permission to offer at trial the testimony of an expert witness respecting the various factors present in this case that might affect the reliability of the eyewitnesses' testimony. On December 19, 2002, that motion was denied because the testimony to be offered by Lester's expert witness did not provide the Court with enough evidence respecting the scientific foundations of the expert's opinions for the Court

to conclude fairly that such conclusions had scientific validity. *United States v. Lester*, 234 F.Supp.2d 595 (E.D.Va.2002) (the "December 19 Opinion"). On January 2, 2003, Lester requested leave to cure the defects in the proffer of testimony. The United States did not object, and Lester's request was granted. An additional hearing was held on January 10, 2003 and supplemental briefing was permitted.

## STATEMENT OF FACTS [1]

Sang Foo Yoon owns the Golden Market store located at the corner of Chestnut and 3rd Streets in the City of Richmond. On August 10, 2002, an armed man attempted to rob the store, and in the process, shot Yoon in the hand. Yoon and one of his employees, Roberta Schwartz, later identified the assailant as the defendant, Cornelius Lester.

A full explanation of the details surrounding the attempted robbery is not necessary in resolving the present motion. However, a brief description of the crime and the anticipated evidence is helpful in understanding the usefulness of the expert testimony that Lester wishes to introduce at trial.

During the daylight hours of August 10, 2002, Yoon was working behind the cashier counter. Schwartz was nearby helping a customer. While Yoon was helping a customer, a black male walked into the store, proceeded to the counter, where he stood behind the customer, pulled out a handgun, pushed the customer to the ground, and demanded that Yoon turn over the money in the store. Yoon did not comply with the robber's demand and, instead, attempted to duck behind the counter, at which point, the robber fired two shots and then fled. One of the shots struck Yoon in the left hand. At the time of the attempted robbery, three or four customers were

in the store. The store is equipped with video surveillance cameras, but they were not functioning at the time of the offense.

Richmond Police Officers arrived at the scene of the crime shortly thereafter, and commenced their investigation. The responding officers found no physical evidence at the scene; and, initially, only Schwartz and another customer in the store were able to provide any information about the appearance of the perpetrator. They described the robber as a black skinned male with a short "afro" hairstyle, who was between the age of 35 and 40, and who wore a grey shirt and dark jean shorts. Yoon could not give a good description of the robber, but told the responding officer that he recognized the man as someone who previously had been in the store. Schwartz confirmed Yoon's assertion on that point.

Several days later, a customer advised Yoon and Schwartz that the man who had committed the robbery was named "Neil." On September 4, 2002, ATF investigators took over the investigation, and, on that date, they solicited a description of the perpetrator from Schwartz, who told the investigators that she recalled the assailant as being approximately 6'1″ tall, weighing about 180 pounds, aged in the mid–40s, and wearing shorts and a blue short-sleeved shirt at the time of the attempted robbery. Schwartz also conveyed her belief that the assailant was a regular customer of the market whose name was Neil. Investigators also obtained a description from Yoon, who speaks and understands limited English and for whom translation was provided by his daughter. Yoon described the perpetrator as a skinny black male, approximately 5'6″ tall, wearing black pants and a black T-shirt. Yoon further told officers that he had seen the

---

**1.** The facts of this case are described in the December 19 Opinion, but, in the interest of clarity and completeness, that description is substantially reproduced here.

robber steal a beer from the store earlier in the day on August 10, and that he believed that the robber came into the store two to three times a week.

Based on this information, the ATF investigators began to suspect that the perpetrator might be Lester and they went to his home on September 19, 2002, where they obtained from Lester relevant identifying information. Based on that information, they obtained from the Richmond Police Department a booking photograph of Lester from an earlier arrest. Using the identifying data about Lester and that photograph, ATF Agent Morella identified five other individuals whose characteristics resembled those of Lester. Morella then made a photospread by using the booking photographs of those five people and Lester.

On September 25, 2002, Morella and her partner returned to the Golden Market with the photospread and showed it to Schwartz, who, with 100% asserted confidence, identified Lester as the robber. On September 30, 2002, the investigators showed the photospread to Yoon who likewise thought Lester was the perpetrator but was somewhat uncertain because the facial fullness of Lester in the photospread was different than that of the robber. Yoon's daughter, who was translating during the interview, then reminded him that the photograph was taken at an earlier time than the robbery. Yoon then asked to view the photospread again. This time he identified Lester with 90% asserted confidence. Shortly thereafter, federal agents arrested Lester and searched his home; however, no incriminating evidence was found and Lester has made no statements.

On November 22, 2002, Lester moved to suppress the identification testimony expected to be given by Yoon and Schwartz, asserting that the pre-trial identification procedures were unduly suggestive, and that any in-court identification testimony by either Yoon or Schwartz would be unreliable. In support of that motion, Lester sought to admit the testimony of Dr. Brian Cutler as an expert in the field of eyewitness memory. At the hearing on December 11, 2002, the Court allowed Dr. Cutler to testify as an expert in the field of photospread identification procedures. Having heard Dr. Cutler's testimony and that of the other witnesses in the case, the Court determined that the photospread identification procedures that the police used in soliciting identifications from both eyewitnesses were not suggestive and, therefore, denied the motion to suppress.

After the ruling on the motion to suppress, Lester made an oral motion in limine requesting that the Court allow Dr. Cutler to testify at trial respecting the general reliability of eyewitness identification. The United States opposed the motion, thereby necessitating a hearing on whether the proposed testimony of Dr. Cutler met the requirements of Fed. R.Evid. 702 as explained in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). With the consent of both parties, the Court then held the *Daubert* hearing without any additional briefing. As explained in detail in the December 19 Opinion, the Court found Dr. Cutler's *Daubert* proffer to be insufficient, concluding that Dr. Cutler had failed to provide "any detailed explanation of the research he relies upon in coming to his various conclusions." 234 F.Supp.2d at 600. Lacking such information, the Court could not conclude that Dr. Cutler's proffered testimony was reliable, and accordingly denied Lester's motion to admit that testimony.

On January 2, 2003, Lester, with the acquiescence of the United States, request-

ed leave to present additional testimony from Dr. Cutler in an attempt to cure the defects identified in the December 19 Opinion. A second *Daubert* hearing was held on January 11, 2003. At the January 11 hearing, Dr. Cutler identified six factors attending the eyewitness identifications in this case that, in his view, might affect the reliability of those identifications: (1) cross-race recognition; (2) exposure time; (3) weapon focus; (4) stress experienced by the witness; (5) retention interval; and (6) the relation between the witness's confidence and accuracy.[2] Dr. Cutler described generally the various studies that formed the basis of these opinions, and explained that his conclusions respecting the effect that these factors have on eyewitness identification generally track the results of meta-analyses and reviews of these subjects conducted by other scholars in the field.

## DISCUSSION

Under Federal Rule of Evidence 702, "scientific, technical, or otherwise specialized knowledge" is admissible if it "will assist the trier of fact to understand the evidence or determine a fact in issue." Under Rule 702, a trial judge may not admit expert scientific testimony unless the proffered scientific evidence is both relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589–90, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The reliability predicate for the admissibility of expert testimony requires that the testimony be based on scientific knowledge and be derived from, and validated by, the scientific method. *Id.* at 590, 113 S.Ct. 2786. The relevance predicate for admissible expert testimony is the requirement from Rule 702 that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* To this end, the scientific testimony must properly "fit" the facts of the case. That is, the trial judge must decide " 'whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.' " *Id.* at 591 (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)); *see United States v. Dorsey,* 45 F.3d 809, 813 (4th Cir.1995) (quoting *Daubert,* 509 U.S. at 590–91, 113 S.Ct. 2786).

In *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court held that trial courts are to apply the requirements of *Daubert* in considering whether to admit expert testimony in non-scientific fields as well. Thus, in areas of expertise based on specialized experience and study, the trial court must perform the "gatekeeping" role specified in *Daubert.*

█ At the December 11 hearing, Dr. Cutler failed to demonstrate to the Court that his opinions respecting the various factors present in this case that might affect the reliability of eyewitness identifications satisfied the reliability aspect of the *Daubert* test. Dr. Cutler testified in conclusory terms that certain factors have been shown to affect the reliability of eyewitness identification, but failed to demon-

2. Counsel for Lester attempted to elicit testimony from Dr. Cutler as to four other factors, each concerning the identification through photograph array: (1) line-up instructions; (2) the selection of foils for the array; (3) the fact that the identification was from a photograph array versus a live line-up; and (4) the manner in which the photographs were presented in the photo array. However, Dr. Cutler had testified at the December 11 hearing on the defendant's motion to suppress the photograph identifications that there was nothing suggestive about the manner in which the photospread identifications were conducted in this case. The Court, therefore, sustained the objection of the United States to any testimony on these factors, concluding that any further testimony on identification procedures would be either duplicative or irrelevant.

strate the scientific reliability of these conclusions.

At the January 11 hearing, Dr. Cutler cured this defect. For each of the identified factors, Dr. Cutler demonstrated that his conclusions were based either upon research of his own, or upon research of others. In each instance, the research contained traditional indicia of scientific reliability: the research was conducted using the scientific method, was subject to peer-review, was published in reputable journals in most instances, and the methods and conclusions appear to enjoy general acceptance in the field of social psychology. Although the Court retains a healthy skepticism of the oftentimes malleable conclusions in the social science fields, Dr. Cutler's conclusions do satisfy the first test of *Daubert.*

The issue now ready for decision is whether the proffered testimony will satisfy the relevance component of the *Daubert* calculus by assisting the trier of fact to understand the evidence or to determine a fact in issue.[3] As explained in the December 19 Opinion, in deciding whether proffered scientific evidence will assist the trier of fact, trial courts must be mindful of both the potential for expert testimony to mislead a jury, and the court's continuing obligation under Rule 403 to exclude evidence, the probative value of which is substantially outweighed by the danger of confusing the jury. *Dorsey,* 45 F.3d at 813. The added caution is necessary because expert testimony often carries a certain aura that might lead a jury to attach more significance to the testimony than is reasonably warranted. "Because of this risk," held the Supreme Court in *Daubert,* "the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control

over experts than over lay witnesses." 509 U.S. at 595, 113 S.Ct. 2786. A trial judge, therefore, may exclude reliable scientific evidence, if the court concludes that the risk of confusing the jury is too great. As the Supreme Court explained in *Daubert:*

> We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.

509 U.S. at 597, 113 S.Ct. 2786.

■ Cognizant of the balance struck in *Daubert,* the Fourth Circuit has established the following benchmark to aid the trial courts in determining whether reliable scientific evidence will actually assist the jury: "[I]n determining whether a particular expert's testimony is sufficiently helpful to the trier of fact to warrant admission into trial, the district court should consider whether the testimony presented is simply reiterating facts already 'within the common knowledge' of the jurors." *Dorsey,* 45 F.3d at 814 (quoting *United States v. Harris,* 995 F.2d 532, 534 (4th Cir.1993)). Evidence falling within the common knowledge of jurors, "almost by definition, can be of no assistance to a jury." *Harris,* 995 F.2d at 534 (citing *Scott v. Sears, Roebuck & Co.,* 789 F.2d 1052, 1055 (4th Cir.1986)).

## A. Expert Testimony On The Reliability Of Eyewitness Identifications And The Relevance Facet Of Rule 702

Proffers of expert testimony on the reliability of eyewitness identification impli-

---

3. To better comprehend the scope and possible impact of Dr. Cutler's testimony, after the second *Daubert* hearing, the Court required counsel for Lester to submit the questions she intended to put to Dr. Cutler on direct examination, along with his anticipated responses.

cate the second facet of the *Daubert* analysis quite strongly. In *Harris,* a pre-*Daubert* case, the Fourth Circuit noted that such testimony may be appropriate only in a narrow range of circumstances. *Harris,* 995 F.2d at 535. In *Harris,* the Fourth Circuit explained that:

> [u]ntil fairly recently, most, if not all, courts excluded expert psychological testimony on the validity of eyewitness identification. But, there has been a trend in recent years to allow such testimony under circumstances described as "narrow." ... The narrow circumstances held sufficient to support the introduction of expert testimony have varied but have included such problems as cross-racial identification, identification after a long delay, identification after observation under stress, and psychological phenomena as the feedback factor and unconscious transference.... Outside of such narrowly constrained circumstances, jurors using common sense and their faculties of observation can judge the credibility of an eyewitness identification, especially since deficiencies or inconsistencies in an eyewitness's testimony can be brought out with skillful cross-examination.

*Id.* at 534–35 (internal citations omitted);[4] *see United States v. Stevens,* 935 F.2d 1380, 1399–1400 (3d Cir.1991); *United States v. Burrous,* 934 F.Supp. 525, 527 (E.D.N.Y.1996). In *Harris,* the Court of Appeals applied this standard and concluded that a trial court did not err in excluding expert testimony on eyewitness reliability where the enumerated factors were not present and the eyewitness testimony was corroborated by other evidence. *Cf. United States v. Jordan,* 924 F.Supp. 443, 448–49 (W.D.N.Y.1996) (concluding that expert evidence on the reliability of eye-witness identification evidence would assist the jury because the testimony of an eyewitness was central to the government's case).

The lesson of *Harris* is twofold, and entirely consistent with the Supreme Court's subsequent decision in *Daubert.* First, *Harris* teaches that trial courts should be extremely reluctant to allow testimony under Rule 702 as to conclusions that are consistent with the common knowledge of juries. *See also Scott,* 789 F.2d at 1055 (noting that Rule 702 makes inadmissible expert testimony as to a matter which *obviously* is within the common knowledge of jurors). In eyewitness identification cases, the Court should assess each factor about which an expert intends to testify and determine whether that factor is one about which the average juror would be aware. Second, and relatedly, trial courts should remain cognizant of the efficacy of traditional methods of trial procedure to equip the jury with information from which it may fairly assess the credibility of eyewitnesses. Skilled cross-examination and argument are more than sufficient to attack reliability where the putative defect in the identification is within the common knowledge of the jury.

*Daubert*'s emphasis on the trial court's continuing obligation under Rule 403 further reinforces the teachings of *Harris.* Expert testimony has the potential to be substantially prejudicial because of the "aura effect" associated with such testimony. In the case of expert testimony about factors that may affect the reliability of eyewitness identification, the "aura effect" could mislead the jury into believing that the presence of such a factor renders an eyewitness identification much less reliable than it actually is. With that risk of preju-

---

**4.** The Court interprets the circumstances enumerated in *Harris* as illustrative rather than mandatory.

dice in mind, the trial court must assess carefully the probative value of the proffered expert testimony, remaining cognizant of the common knowledge of the average juror, and mindful of the efficacy of traditional trial procedures. Only when the proffered testimony is clearly beyond the jury's common knowledge, thereby rendering traditional trial procedures ineffective in exposing the possible defect in the reliability of the identification, is it possible that evidence of the sort contemplated in this case can survive the restrictions of Rule 702.

However, even if the proponent of the expert testimony on eyewitness reliability demonstrates that the factor affecting reliability of an identification is not clearly common knowledge, the testimony may still run afoul of Rule 403 if the expert cannot adequately explain to the jury in concrete terms the degree of impact on accuracy that the factor has been demonstrated to have. *See Downing*, 753 F.2d at 1242 (holding that in order for expert testimony on eyewitness reliability to be admissible, the proponent of the evidence must explain *"precisely* how the expert's testimony is relevant to the eyewitness identifications under consideration"). Although pinpoint precision certainly is not required, some level of lucid quantification is necessary in order to allow the jury to use effectively the information the expert provides, and to assess independently the credibility of the expert. Otherwise, instead of "provid[ing] the jury with more information with which the jury can then make a more informed decision," *United States v. Hines*, 55 F.Supp.2d 62, 72 (D.Mass.1999), the testimony and the "aura" that comes with it very well might overwhelm and confuse the jury.

For example, if Dr. Cutler were to testify that "people are more likely to misidentify persons of races other than their own," the average juror, overly-impressed by the patina that attaches to "expert" testimony, might well conclude that the task of cross-race identification is hopeless. That, at least, is the Supreme Court's concern in *Daubert*. Although quantification may cure that problem, it too can be problematic because oftentimes oral attempts to quantify create more questions than they answer. If Dr. Cutler were to testify that "a person is 1.5 times more likely to misidentify a person of another race," the average juror might have trouble grasping exactly what that means.[5] Indeed, this particular formulation begs the question, "1.5 times what?" Confusion on a collateral issue such as this is, at a minimum, troublesome, because it creates the very real possibility that the jury will be diverted from deciding the core issues of the case.

■ Taken together, *Daubert, Kumho, Harris* and decisions specifically addressing the admissibility of expert testimony respecting the reliability of eyewitness identification suggest that a three-step approach is appropriate when considering whether the relevance facet of *Daubert* has been satisfied in cases where a party seeks to introduce expert testimony respecting the reliability of eyewitness identification. First, the trial court must assess the significance of eyewitness identification in the prosecution's case. Where the prosecution's case relies exclusively on the identification testimony of eyewitnesses, expert evidence could be quite probative. *See e.g., Jordan*, 924 F.Supp. at 449. In cases where eyewitness identification evidence is but one of several types of evidence impli-

---

**5.** A review of the transcript of the second *Daubert* hearing indicates that this is not merely idle speculation. (*See* Jan. 10, 2003 Tr. at 39:10—44:8.) Indeed, that testimony is quite confusing.

cating the defendant, expert evidence on reliability of identification will be much less probative. *See e.g., Harris,* 995 F.2d at 535–36. As explained in *Jordan:*

> The 5th, 6th and 8th Circuits have found that there is no abuse of discretion where trial courts exclude eyewitness identification expert testimony in cases where the eyewitness identification is only a small part of the Government's case. These cases suggest that where a prosecutor relies wholly on eyewitness identifications, such expert testimony should probably be admitted. *See United States v. Blade,* 811 F.2d 461 (8th Cir.) (finding no abuse of discretion in decision to exclude expert testimony where Government's case relied on more than only the eyewitness identification), *cert. denied,* 484 U.S. 839, 108 S.Ct. 124, 98 L.Ed.2d 82 (1987); *United States v. Moore,* 786 F.2d 1308 (finding no abuse of discretion in decision to exclude expert testimony where eyewitness identification only a small part of Government's case but noting that admission would be proper where such identification is the only evidence), *reh'g denied,* 791 F.2d 928 (5th Cir.1986); *United States v. Smith,* 736 F.2d 1103 (6th Cir.) (finding harmless error in decision to exclude expert testimony where there were 3 separate eyewitnesses and a definitive palm print) *cert. denied,* 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984); *see also United States v. Alexander,* 816 F.2d 164 (5th Cir.1987) (reversing as clearly erroneous decision to exclude testimony on photographic comparison where entire case turned on photographic identification).

*Jordan,* 924 F.Supp. at 447 (emphasis in original).

Second, the trial court must assess whether the factors about which the expert intends to testify are both relevant to the identifications in the case, *see Downing,* 753 F.2d at 1242, and beyond the common knowledge of the average juror. *See Harris,* 995 F.2d at 534. If the trial court concludes that the testimony is either irrelevant, or falls clearly within the boundary of the average juror's common knowledge, the expert evidence would not assist the jury, and, therefore, it should be excluded under Rule 702. *Id.*

Finally, the trial court must conduct the Rule 403 balancing test, and determine whether the probative value of the expert evidence, as that testimony is proffered, in the first phase of the inquiry is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" *See e.g., United States v. Hicks,* 103 F.3d 837, 847 (9th Cir.1996) (affirming decision of trial court to exclude expert evidence on eyewitness reliability under Rule 403 because testimony would confuse jury and waste time at trial); *Burrous,* 934 F.Supp. at 527–29 (excluding expert testimony on eyewitness reliability because the testimony created the risk of confusing the jury). For instance, where the expert intends to testify in the broadest terms about the effect of a certain factor, without any attempt to explain in concrete terms the impact associated with that effect, the jury will be unable to use effectively the information the expert provides. And, more importantly, the lack of quantification creates an almost always unacceptable risk of misleading the jury, principally because of the "aura effect" identified in *Daubert.*

### B. Admissibility Of The Proffered Testimony In This Case

With this approach in mind, the various factors about which Dr. Cutler intends to testify will now be considered. As discussed above, Dr. Cutler has identified six factors—(1) cross-race recognition; (2) exposure time; (3) weapon focus; (4) stress experienced by the witness; (5) retention interval; and (6) the relation between the

witness's confidence and accuracy—present in this case that have been shown to affect the reliability of eyewitness identification, and he intends to testify about each.

Under the first step in the applicable calculus, the December 19 Opinion makes clear that evidence respecting the reliability of eyewitness identification could be probative because of the fact that different witnesses have given different descriptions at different times. Furthermore, the case against Lester depends almost exclusively on the testimony of two eyewitnesses. Lester's guilt or innocence will depend largely on whether or not the jury finds testimony of these eyewitnesses to be reliable. The testimony as to each of the factors that Dr. Cutler has identified, therefore, has probative value.

■ Under the second phase of the inquiry, the record respecting which factors fall within the common knowledge of ju-

rors is rather sparse. At the second *Daubert* hearing, Dr. Cutler, in a conclusory fashion, testified that, based on research and experience, he believed that his conclusions respecting the reliability of eyewitness identification are not a matter of common sense. (Jan. 10, 2003 Tr. at 34:17—35:3.) This testimony is not particularly helpful, however, because it does not address each factor separately, and directly contradicts generally accepted judicial precepts respecting common sense as it relates to two of the factors: exposure time and retention interval. Dr. Cutler intends to testify that longer exposure times result in more reliable identifications, and that there is a significant linear relationship between retention interval and accuracy—*i.e.*, the longer the interval between the event and the identification the less reliable the identification. These highly intuitive conclusions are encompassed by the standard federal jury instructions on identification evidence.[6]

---

**6.** For example, one noted instruction in use in the federal courts tell the jury:

> One of the most important issues in this case is the identification of the defendant as the perpetrator of the crime.... If you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you must find the defendant not guilty.
>
> Identification testimony is an expression of belief on the part of the witness. Its value depends on *the opportunity the witness had to observe the offender* at the time of the offense and, later, to make a reliable identification of the offender.
>
> You have heard the arguments of counsel on this subject, and I will not repeat them all here. I will only suggest to you that you should consider the following matters: *Did the witness have the ability to see the offender at the time of the offense?* Has the witness' identification of the defendant as the offender been influenced in any way? Has his identification been unfairly suggested by events that occurred since the time of the offense? Is his recollection accurate? In addition, you should consider the credibility

of the identification witness just as you would any other witness.

1 Leonard B. Sand, *et al.*, *Modern Federal Jury Instructions*, Inst. 7–20 (2002) (emphasis added). Another widely-used instruction provides:

> One of the [most important] issues in this case is the identification of Defendant as the person who committed ˙the crime[s] charged in [Count[s] ___ of] the indictment.... If you are not convinced beyond a reasonable doubt that Defendant was the person who committed the crime[s] charged in [Count[s] ___ of] the indictment, you must find the defendant not guilty.
>
> Identification testimony is, in essence, the expression of an opinion or a belief by the witness. The value of the identification depends upon *the opportunity that the witness had to observe the person who committed the crime at the time of the offense* and the opportunity to make a reliable identification at a later time.
>
> In judging the identification testimony of any witness you should consider at least the following questions:
>
> 1. Are you convinced that the witness had the ability and *an adequate opportunity*

In fact, this Court's standard instruction addresses both factors:

> In evaluating the identification testimony of a witness you should consider all of the factors already mentioned concerning your assessment of the credibility of any witness in general, and should also consider, in particular, whether the witness had an adequate opportunity to observe the person in question at the time or times about which the witness testified. You may consider, in that regard, such matters as *the length of time the witness had to observe the person in question* . . . You may also consider the circumstances surrounding the identification itself including, for example, . . . *the length of time that elapsed between the incident in question and the next opportunity the witness had to observe the defendant.*[7]

Dr. Cutler's conclusory opinion that the factors affecting reliable eyewitness identi-

fication are beyond the common sense of jurors is insufficient to overcome the well-recognized contrary jurisprudence as to these two factors.[8]

▮ However, the other four factors—the problem of cross-race recognition, the phenomenon of weapon focus, the relationship of different levels of stress on eyewitness perception, and the correlation (or lack thereof) between confidence and accuracy—do seem to fall outside the common sense of the average juror. At a minimum, it cannot be confidently said that these factors obviously would be within the common knowledge of the average juror. As a result, even the most skilled advocate could find the task of impeaching the reliability of an eyewitness based on these factors to be daunting, if not impossible. Therefore, testimony about these factors could satisfy the relevance requirements of Rule 702, and, in this case, they do.

---

to observe the person who committed the crime?

Whether the witness had an adequate opportunity to observe the person committing the offense at the time of the offense will be affected by many things, *including the length of the observation*, the distance between the witness and the person observed, the lighting conditions, and whether the witness knew the person from some prior experience . . . .

1A Kevin F. O'Malley, *et al.*, Federal Jury Practice and Instructions, § 14.10 (5th ed.2000).

**7.** The Court's standard instruction is taken from the Fifth Circuit District Judges' Ass'n, *Pattern Jury Instructions* § 1.29 (1990).

Further proof that Dr. Cutler's conclusions respecting exposure time and retention interval are a matter of common sense can be found in *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), where the Supreme Court, in a related context, identified several factors that are relevant in determining whether an identification was reliable. Those factors include "the opportunity of the witness to view the criminal at the time of the crime" and "the length of

time between the crime and the [identification]." *Id.*

**8.** In *United States v. Norwood*, 939 F.Supp. 1132, 1138, 1141 (D.N.J.1996), another federal district court reached the opposite conclusion regarding common knowledge as to these two factors. *Norwood* is noteworthy here, not because of the court's decision respecting admissibility, but because the expert there proffered testimony as to retention interval and exposure time that is markedly different from that proffered by Dr. Cutler here. There, the expert testified that "memory decreases at a non-constant rate" over time, *id.* at 1138, and respecting exposure time, the expert testified that under some circumstances, prolonged exposure time may not increase the accuracy of identification. *Id.* at 1141. Here, Dr. Cutler intends to testify that there is a significant linear relationship between retention interval and accuracy, and that accuracy increases as length of exposure increases. Without passing judgment on which expert is correct, this Court merely notes that the scientific conclusions in this field are highly malleable, and accordingly, highly suspect.

Turning then to the third segment of the approach suggested by the applicable jurisprudence, Lester has demonstrated that only three of the four remaining factors satisfy the requirements of Rule 403. Respecting the effect of weapon focus on the reliability of eyewitness identifications, Dr. Cutler intends to explain that "[w]eapon focus refers to the eyewitness's tendency to focus his or her visual attention on the weapon. When an eyewitness does this, the eyewitness has less attention to focus on a perpetrator's facial or physical characteristics." (Deft. Proposed Questions and Answers (Docket Nr. 30) at 4.) In addition to explaining that weapon focus has a negative impact on reliability, Dr. Cutler will also quantify this impact by explaining that "[e]ffect on identification accuracy is small but significant (10% difference in accuracy)." Because Dr. Cutler quantified the impact of weapon focus, and did so with sufficient clarity, the risk that this testimony might confuse the jury does not substantially outweigh the testimony's probative value.

As to the impact of stress on the reliability of eyewitness identifications, Dr. Cutler intends to explain that "there is an inverted U shape relation between stress and the reliability of the eyewitness identification. This means that, under conditions of moderate stress, the reliability of eyewitness identifications would be expected to be higher, but under extreme levels of stress, eyewitness accuracy would decline." (*Id.* at 4.) While this method of quantification is relative, it nonetheless provides jurors with a benchmark sufficient to allow them to make a reasoned assessment of the impact of stress on the identifications in this case. The risk of confusion, therefore, is low, and does not substantially outweigh the testimony's probative value.

About the correlation between eyewitness confidence and the accuracy of identification, Dr. Cutler intends to explain that there is only a modest correlation between confidence and accuracy: "eyewitnesses who are highly confident only somewhat more likely to be correct than eyewitnesses who are minimally confident." (*Id.* at 7.) Although this method of quantification is admittedly not as concrete as the testimony about weapon focus and stress, Dr. Cutler Dr. Cutler does cabin his conclusion as to this factor sufficiently enough to avoid a substantial risk of confusion as a result of the aura effect. Moreover, this testimony does not challenge the conventional wisdom respecting the ability of an eyewitness to perceive events under certain circumstances, but merely the fact that eyewitness confidence is not always a good predictor of accuracy. This testimony, therefore, likewise satisfies the requirements of Rule 403.

When explaining the effect of cross-race recognition, however, Dr. Cutler has failed to cabin his conclusions within any concrete bounds, and therefore, this testimony creates a substantial risk of confusing the jury. Dr. Cutler intends to explain that "[a] cross-racial identification is the identification of an individual of one race by an eyewitness of another race, such as an identification of a White perpetrator by a Black eyewitness[,]" and that "[e]yewitnesses are more accurate at identifying people of their own race than of other races." (*Id.* at 3.) Dr. Cutler, however, has not attempted to quantify this impact, even in general terms.[9] This testimony, there-

---

9. At the second *Daubert* hearing, Dr. Cutler explained that "witnesses were 1.4 times more likely to correctly identify a previously viewed own race person ... [a]nd they were 1.56 times more likely to falsely identify somebody of another race." (*See* Jan. 10, 2003 Tr. at 39:10—44:8.) This attempt at quantification created substantial confusion, and when pressed, Dr. Cutler could not explain to the Court's satisfaction what exactly he meant by this. Counsel for Lester did not include this testimony in the proffer of direct

fore, creates a risk of confusion that substantially outweighs its probative value.

In sum, the testimony as to three of the six factors that Dr. Cutler identified satisfy the strict requirements of Rules 702 and 403, as interpreted by the Fourth Circuit in *Harris,* and the Supreme Court in *Daubert* and *Kumho.* Dr. Cutler will be permitted to testify as to the effects that weapon focus and stress have on the ability of eyewitnesses to perceive events, as well as the correlation (or lack thereof) between the confidence with which a witness makes an identification, and the accuracy of that identification. Direct testimony in this regard will be limited to the conclusions Dr. Cutler has reached respecting these factors as expressed in the proffer of direct testimony submitted by counsel for the Defendant following the second *Daubert* hearing.

### CONCLUSION

For the foregoing reasons, the motion of the Defendant to admit the expert testimony of Dr. Brian Cutler is hereby GRANTED in part and DENIED in part, subject to the limitations noted herein.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

testimony submitted following the second *Daubert* hearing.